AMAZIAH HAYNER

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed December 22, 1904.*

1. CRIMINAL LAW—*it is not a matter of right for private attorney to assist prosecution.* Granting permission to an attorney whose services are gratuitous or paid for by private parties to appear as an assistant to the State's attorney is a matter resting in the discretion of the court, whose duty it is to see that the criminal law is not used to gratify personal ends and to permit such assistance, only, as fairness and justice may require, without oppression to defendant.

2. SAME—*section 6a of act of 1903 relating to State's attorneys construed.* Section 6a of the act regarding State's attorneys, added in 1903, (Laws of 1903, p. 85,) prohibiting State's attorneys from receiving any reward from private persons for performance of official duties, does not limit the court's discretion to permit counsel, paid by private parties, to assist the State's attorney in prosecuting a criminal case.

3. SAME—*when homicide in defense of habitation is justifiable.* As distinguished from homicide in self-defense in a public place, where a reasonable belief of danger to life or great bodily injury is necessary to a justification, homicide in defense of habitation is justifiable if the victim was manifestly intending, and endeavoring in a violent and tumultuous manner, to enter the habitation for the pur-

pose of assaulting or offering personal violence to any person dwelling therein.

4. SAME—*one may, if necessary, take life in defense of habitation.* A man may, within his own house, use all needful force to keep an aggressor out, even to the taking of such aggressor's life.

5. SAME—*peril of life or of great bodily harm not essential to justify defense of habitation.* A man in his own habitation may resist with force an unlawful, violent entry by one whose purpose is to assault or offer violence to him, even to the extent of taking the aggressor's life, although the circumstances may not be such as to justify a belief of actual peril to life or great bodily harm.

6. INSTRUCTIONS—*when instructions should not be given.* Instructions in a criminal case which are not based upon the evidence, or which are misleading, useless, irrelevant or confusing, should not be given.

7. SAME—*when instruction as to duty of jury in considering evidence is improper.* An instruction telling the jury that their power and duty to judge the effect of the evidence are not arbitrary, but should be exercised with legal discretion and in subordination to the rules of evidence, is improper, where there is no explanation of legal discretion nor of the rules of evidence to which their judgment should be subordinate.

8. SAME—*instruction permitting the jury to fix punishment for manslaughter is erroneous.* An instruction informing the jury that one who is guilty of manslaughter is to be imprisoned for his natural life or any number of years, and if they found accused guilty they should fix his punishment by their verdict, is erroneous.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. AXEL CHYTRAUS, Judge, presiding.

W. P. BLACK, and C. D. F. SMITH, for plaintiff in error.

H. J. HAMLIN, Attorney General, CHARLES S. DENEEN, State's Attorney, and HARRY OLSON, for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Amaziah Hayner, plaintiff in error, was indicted in the criminal court of Cook county for the murder of Henry Martin. A trial resulted in a disagreement of the jury, but on a second trial a verdict was returned finding the defend-

ant guilty of manslaughter and fixing his punishment at im-
prisonment in the penitentiary for a term of one year. The
court disregarded that part of the verdict fixing the term of
imprisonment and sentenced him to confinement in the peni-
tentiary for an indeterminate period, in accordance with the
statute.

The death of Henry Martin resulted from a shot from a
revolver fired by the defendant in defendant's kitchen in the
rear flat on the second floor of No. 4433 State street, in Chi-
cago. The only persons present in the room at the time
were Martin and the defendant, and the evidence, except the
testimony of the defendant, was confined to what occurred
previously. The buildings numbered 4431 and 4433 State
street were occupied on the lower floors by storerooms.
Above the storerooms in each building were three floors
finished as flats and divided into front and rear flats. Above
the storeroom in 4433 the rear flat was occupied by the de-
fendant, Hayner, a widower, and his daughter, a stenog-
rapher and typewriter, and he had charge of the flats in that
building as janitor. The next flat above was occupied by
Mrs. Lawson and the rear top flat by Mrs. Clay. Above the
storeroom of 4431 the rear flat was occupied by Mrs. Kenny,
the next by Mrs. Draper and the top flat by Mrs. Beard.
There were rear porches and stairways, above each other, to
both buildings, with an outer railing, and a railing extending
across the porches separating the buildings. On the after-
noon of September 4, 1902, the defendant called upon Mrs.
Beard at her flat on the top floor of No. 4431 for the key of
a front flat in No. 4433, from which she had recently re-
moved. He sat for a time on the railing or banister between
the porches of Mrs. Clay and Mrs. Beard, talking with the
latter. Martin was a business agent or walking delegate of a
carpenters' union, and at that time came up the stairway to
Mrs. Beard's porch. He was intoxicated, and when asked
what he wanted said he was looking for a carpenter by the
name of Garlof. Mrs. Beard told him that Garlof did not

live there and requested him to go down-stairs. He inquired the name of the building, and she replied that she did not think it had any, and referred the question to the defendant, who said he had lived there fourteen years and that it had no name, and he informed Martin that Garlof had moved farther south on State street. Mrs. Beard requested Martin to go down-stairs, and he replied with profane and obscene language and refused to go. Mrs. Beard and defendant tried to persuade him to leave, but he would not. He walked to the dividing railing where the defendant sat and stepped over it to Mrs. Clay's porch, and as he went over he called Mrs. Beard the vilest name that can be applied to a woman, accompanied with an oath. The defendant became very much excited and took hold of a step-ladder, saying to Martin that he had insulted the woman as long as he could stand it, and pushed the ladder sideways against Martin. Defendant then dropped the ladder and picked up a broom. The evidence was contradictory as to whether at this time Martin struck the defendant or said that he did not want to fight. Defendant attempted to strike Martin with the broom but did not hit him, and the broom went out of his hands across the porch. Mrs. Clay then tried to get Martin to go down-stairs and agreed to go with him. They started to go down together, and when they had gone three or four steps Martin stopped and wanted to go back, but she persuaded him to go on. When they reached the bottom of that flight of stairs they turned on the porch between the railing and the brick wall and went to the head of the next stairway, which descended to the porch on the second floor, where defendant's apartments were. The defendant came down-stairs, and as Mrs. Clay and Martin stood at the head of that stairway defendant laid his hand on the railing near the door and jumped over, reaching the stairway three or four steps farther down in front of them. Martin then kicked the defendant twice in the back as he went down the stairs, Martin following him to the bottom of the stairs, when Mrs. Clay went back to her

213—10

own flat above. The defendant went to his own door and went into his kitchen, opening a screen door, which shut behind him. He went on into the bed-room and got a revolver which he kept there, and returned to the kitchen door and pushed the screen open. When Martin reached the bottom of the stairs on that floor he was near a passageway leading to State street, by which he could go out the way he came in. Instead of doing that he turned back a few steps to the door of the defendant and took hold of the screen door with his left hand, holding it partly open. Defendant asked him what he was doing there, and told him to get out,—that he did not want any further trouble with him. Defendant had the revolver in his hand, hanging by his side and swinging it around. As Martin stood there he said to the defendant: "Shoot, damn you! shoot!" The defendant thereupon fired a shot, which made a flesh wound on the upper part of Martin's arm with which he was holding the door. Martin's arm slipped down the door, and, as a witness described it, he lunged forward into the kitchen, the screen door closing behind him. Nothing was seen from the outside after that, except through the screen door, and the only witness who saw anything testified that he saw Martin's arm going back and forth but was unable to state what he was doing. The first shot was followed very soon by another, which severed the femoral artery in the left leg and proved fatal. There was a great quantity of blood on the floor near the middle of the kitchen, and about the time of the shots Martin was heard to say: "You have shot me; give me a rag." There was testimony that the defendant, as he went down the stairs, said: "I will show you; I will shoot you;" but this was contradicted. The defendant was seventy-three years of age and weighed about one hundred and forty-seven pounds. Martin was thirty-six years old, and weighed, according to the testimony of his widow, one hundred and eighty pounds. The coroner's physician testified that he weighed two hundred and ten pounds. The parties had not been acquainted with each

other and there was no hostility between them, except such as was aroused by the conduct of Martin on this occasion. The defendant testified that he fired the first shot when Martin said "shoot," not intending to injure him but only to frighten him, and the wound in the arm would have had no serious effect. He testified that following that first shot Martin came into the room towards him and he backed up and Martin attempted to strike him; that Martin was close to him and he was holding the pistol down; that it was an automatic revolver, and he thought that in his excitement he pulled the trigger without knowing it.

The first error assigned is, that the court permitted W. S. Elliott, Jr., an attorney not connected with the office of the State's attorney but hired and paid by the carpenters' union, to assist the State's attorney and take a prominent part in the trial. When the objection was made it was agreed that Mr. Elliott would testify that the carpenters' union had paid him a retainer, amounting to several hundred dollars, for his services in the prosecution of the defendant, and had become liable to pay him a considerable sum as fees in such prosecution. It is not the right of an attorney to appear as assistant of the State's attorney, whether his services are gratuitous or paid for by private parties, but the State's attorney, as a public officer, must have the direction and assume the responsibility of the prosecution. It would be manifestly improper to permit counsel paid by private parties to supplant the constituted officer of the law and to assume the management of the case, but we do not think it is beyond the power of the court to permit counsel paid by private parties to assist the State's attorney where there is no oppression of the defendant or injustice to him. In granting such permission the court should see that the criminal law is not being used to gratify malice or personal ends, but cases frequently arise where the administration of public justice requires that the State's attorney should have assistance. There are cases where the State's attorney is clearly outclassed and over-

matched by counsel for the defendant. Such matters must be left largely to the discretion of the court, whose duty it is to prevent oppression of the defendant and to permit such assistance as fairness and justice may require. It might be a wrong and oppression to a defendant to permit able and experienced counsel employed by private parties to assist a competent State's attorney in a contest with inexperienced or inefficient counsel for the defense.

Counsel for plaintiff in error call attention to the new section added in 1903 to the act in regard to attorneys general and State's attorneys, which provides that the State's attorney shall not receive any fee or reward from or in behalf of any private person for any services within his official duties, and shall not be retained or employed, except for the public, in a civil case depending upon the same state of facts on which a criminal prosecution shall depend. (Laws of 1903, p. 85.) It is insisted that in view of this statute the law should be that counsel assisting the State's attorney should be as unprejudiced and impartial as a public prosecutor. We do not think the statute was intended to prohibit the court, in the exercise of a sound discretion, from permitting counsel paid by private parties to assist the State's attorney where it may seem necessary. It must be presumed that the discretion was properly exercised in this case, and we find nothing in the record to indicate the contrary.

The instructions are complained of, and upon inspection we find they do not present a connected or consistent theory of the rights of the defendant in the defense of his habitation. The defense was that the fatal shot was fired in opposing an entry into the defendant's habitation against his will, for the purpose of assaulting him. On the part of the defendant the court instructed the jury that a homicide is justified when the killing is in the defense of one into whose dwelling the person killed forces his way against the protest of the occupant, for the purpose of assaulting or offering personal violence to such person; that if Martin had, with violence

and against the protest of defendant, entered the place of residence of defendant, and the defendant in good faith reasonably believed that Martin intended to offer personal violence to him or assault him, and Martin threatened then and there, with word or gesture, to assault the defendant, and the defendant acted under the influence of fears of personal violence or an assault and not in a spirit of revenge, the shooting was justifiable and the jury should acquit the defendant. In giving instructions at the request of the prosecution the court ignored all distinctions between a homicide committed in self-defense in a public place, where both parties have equal rights, and a homicide committed by a person in his own habitation of one entering it, against his will, for the purpose of assaulting or offering personal violence to him. Accordingly, the jury were told that the defendant, in order to justify the killing on the ground that it was in defense of habitation, property or person, must in good faith have believed that the killing was necessary either to preserve his own life or prevent his receiving great bodily harm, and that if the circumstances would not induce a reasonable person to believe, and the defendant did not believe, he was in danger of losing his own life or was in great bodily danger, then he had not established his defense. These instructions stated the law to be, that the defendant had no right to take the life of Martin unless it was apparently necessary in order to prevent the commission of a felony or to defend himself against loss of life or great bodily harm.

There are text books and decisions which state the rule as given in these instructions, making no distinction whatever between the right of self-defense generally and the right of defense by a person in his own habitation, and it has been said that the extent of the right to defend the habitation and persons in it is involved in some obscurity and confusion. That, however, cannot be said of this State, where, both by statute and decision, the right has been clearly defined. Section 148 of division I of the Criminal Code defines justifi-.

able homicide as follows: "Justifiable homicide is the killing of a human being in necessary self-defense, or in the defense of habitation, property or person, against one who manifestly intends or endeavors by violence or surprise to commit a known felony, such as murder, rape, robbery, burglary and the like, upon either person or property, or against any person or persons who manifestly intend and endeavor, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein. A bare fear of any of these offenses, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge." (Hurd's Stat. 1899, p. 595.) Section 149 relates only to the necessary self-defense mentioned in section 148, as is apparent from its language. That section provides that if a person kill another in self-defense, it must appear that the danger was so urgent or pressing that in order to save his own life or to prevent great bodily harm the killing of the other was absolutely necessary, and also that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given. Section 148 declares homicide justifiable in the defense of habitation, property or person against any person who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein. An assault or offer of personal violence does not necessarily imply danger to life or great bodily harm. In *Reins* v. *People,* 30 Ill. 256, the judgment of conviction was reversed and it was held that the first instruction asked by the defendant should have been given. That instruction was based upon the statute,

and declared the law to be that if defendant, Reins, in defense of himself, inflicted upon deceased the wounds or stabs which caused his death, while the deceased was manifestly intending and endeavoring, in a violent manner, to enter the habitation of the witness Mrs. Foley for the purpose of assaulting or offering personal violence to the defendant, Reins, being therein, the killing was justifiable and the jury must acquit the defendant. In *Davison* v. *People,* 90 Ill. 221, the court held that a mere trespass to property would not justify the killing of the trespasser, but expressed the view of the court as to habitation by saying (p. 229) : "A man's house is his castle, and he may defend it even to the taking of life, if necessary or apparently necessary to prevent persons from forcibly entering it against his will and when warned not to enter and to desist from the use of force." We think, also, the general rule is, that a person within his own house may exercise all needful force to keep an aggressor out, even to the taking of his life. A man in his own habitation may resist force with force, and oppose an unlawful entry against his will by one who in a violent manner attempts to enter with a purpose of assaulting or offering violence to him, even to the extent of taking life, although the circumstances may not be such as to justify a belief that there was actual peril of life or great bodily harm. (2 Bishop on Crim. Law, sec. 653; 2 Wharton on Crim. Law, sec. 1024; *Pond* v. *Pond,* 8 Mich. 150.) The instructions were in conflict with each other, and those given at the request of the prosecution were not correct.

It is said by counsel for the People that the defendant was clearly guilty and therefore could not be prejudiced by incorrect instructions. We cannot say that there must necessarily have been a verdict of guilty. The defendant had a right to the judgment of the jury under correct instructions as to the law. He had a right to have his testimony and all the circumstances considered by the jury for the purpose of determining whether Martin attempted to enter his kitchen

against his will for the purpose of assaulting him, and whether, in reasonably resisting such entrance, he fired the fatal shot, accidentally or otherwise. It cannot be said that the erroneous instructions were not prejudicial.

There were a great many instructions given at the request of the People introducing to the jury all sorts of legal propositions inconsistent with the facts of the case or not founded upon them. For instance, the tenth stated the law in case the evidence showed that Martin attacked the defendant and afterward abandoned the attack and retreated and the defendant became the aggressor and pursued and killed Martin. There was no evidence to which the instruction could be applied. The instructions given at the request of the People were thirty-two in number,—more than three times the number given at the instance of the defendant. Many of them were wholly uncalled for. A few plain and simple instructions which the jury could understand were all that were required, and the practice of encumbering the record and troubling the jury with useless and irrelevant instructions is a pernicious one, frequently condemned. *Dunn* v. *People,* 109 Ill. 635; 11 Ency. of Pl. & Pr. 150.

The ninth instruction given at the request of the People was abstract in form, assuming to state a case where "one," evidently intended to be applied to the defendant, assaults "another," intended to be applied by the jury to Martin; but as the instruction proceeded, the terms "one" and "another" were transposed, and the defendant became "another" and Martin became "one." While we can see what was meant, the instruction was confusing and misleading and should not have been given.

Instruction numbered 37 is criticised, and counsel for the People concede that the criticism is just. The jury were told that their power and duty to judge the effect of the evidence were not arbitrary, but should be exercised with legal discretion and in subordination to the rules of evidence. There was no explanation what constituted legal discretion or what

rules of evidence their judgment should be subordinate to. The question in the case was whether the killing was done in reasonably resisting the entry of Martin in a violent manner into the dwelling house of defendant for the purpose of assaulting him, and the law on that subject could have been stated to the jury very clearly and briefly.

Instruction numbered 33 given at the instance of the People told the jury that whoever is guilty of manslaughter is to be imprisoned for his natural life or any number of years, and if the accused should be found guilty the jury should fix his punishment by their verdict. The jury, in obedience to the instruction, fixed the punishment at one year in the penitentiary. The court disregarded that part of the verdict, and the defendant filed affidavits of three jurors to the effect that the verdict was a compromise, by which the defendant was found guilty provided all should agree that the punishment should not continue longer than one year; that the verdict of guilty would not have been returned except for that agreement, and that the jurors in question would never have consented to a verdict of guilty if they had not understood that they had the right to fix the punishment as they were instructed and had fixed it at one year. Affidavits of jurors cannot be received to avoid their verdict. (*Sanitary District* v. *Cullerton,* 147 Ill. 385.) Whether that rule applies to the particular circumstances of this case or not, we think the erroneous instruction permitting the jury to fix the term may very likely have been harmful to the defendant. The jury fixed the shortest term possible under the law, while the court imposed a sentence which was, in effect, for the maximum term, unless shortened in accordance with the Parole law. The record does not show that the error in giving the instruction was not prejudicial.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*