(No. 14143.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANCIS X. WILLY, Plaintiff in Error.

*Opinion filed December 22, 1921—Rehearing denied Feb. 16, 1922.*

1. CRIMINAL LAW—*character evidence should be confined to the proof of reputation at or prior to the crime.* Evidence of good character, or of bad character in rebuttal, should be confined to proof of general reputation at or prior to the commission of the offense, and it must not be allowed to cover reputation after the commission of the offense, or what was said after the offense with reference to the character of the accused either before or after the commission of the crime.

2. SAME—*general rule as to remoteness of character evidence.* While evidence of character should be confined to a time not very remote from the commission of the crime, no certain limit in point of duration can be laid down as to such evidence, but as a general rule it should relate to the time when the character of the person will tend to illustrate the act in question.

3. SAME—*character is provable by general reputation and not by personal opinion of witness.* The character of the accused is provable only by evidence of general reputation, and the personal opinion of the witness is not competent evidence.

4. SAME—*evidence of specific acts of bad conduct is not admissible to prove bad character—cross-examination.* It is error to permit a character witness to be cross-examined as to his own knowledge of particular acts of bad conduct by the accused, but a witness to good character may be asked, on cross-examination, if he has heard rumors or conversations concerning particular charges of the commission by the accused of acts inconsistent with the character which he is called upon to prove.

5. SAME—*evidence of reputation more than ten years prior to the crime is too remote.* Where it appears on cross-examination of character witnesses testifying in rebuttal that their testimony as to the bad character of the defendant is based merely on their own personal belief as to his bad character or upon their knowledge of bad reputation more than ten years before the commission of the offense charged, with no proof to show the continuation of such reputation, the evidence of such witnesses should be stricken on motion.

6. SAME—*what statement of officer at time of arrest of defendant is not admissible.* In a murder trial a statement by the officer who arrested the defendant at his home immediately after the

homicide, to the effect that the defendant had better hurry,—that "there was quite a crowd gathering outside," should not be admitted in evidence, as it suggests that there was danger of mob violence because of the homicide and has no bearing on the guilt or innocence of the defendant.

7. SAME—*what statement by deceased is not a part of res gestæ.* In a trial for murder, where the homicide resulted from one of four shots fired during a fight between the defendant and the deceased, the wife of the deceased should not be permitted to testify that after two shots were fired her husband said, "He shot me twice," as such statement is not part of the *res gestæ;* but the admission of such evidence is not prejudicial error where the evidence shows that the defendant fired two shots before the statement was made, both of which wounded the deceased.

8. SAME—*what evidence is admissible as showing defendant's fear of the deceased.* Where the defendant is being tried for the murder of a neighbor with whom he had had a long-standing quarrel and who was physically his superior, a justice of the peace, who is testifying in regard to the defendant's application at one time to have the deceased put under a peace bond, should be permitted, on cross-examination, to testify to any official information which the defendant was given at that time as to his right to protect himself by such prosecution and as to any statement made by the defendant showing his fear of the deceased, but proof of the terms of the complaint made by the defendant is not material.

9. SAME—*counsel, during argument, should not be permitted, over objection, to read memorandum of testimony.* It is error to permit counsel for the prosecution, during his argument, to read from his memorandum of the testimony over the objection of defendant's counsel or to permit counsel to read from the transcript of the evidence taken by the reporter, as such practice tends to over-emphasize the testimony which is read and should not be allowed merely to settle disputes between counsel as to what was testified to, as that question is for the jury.

10. SAME—*when instructions as to self-defense should not disregard theory of defense of habitation.* Where the defendant in a murder trial rests his case upon the theory that the crime was committed in self-defense and to prevent the deceased from entering the defendant's house, instructions which the jury may apply to either the defense of self or of habitation should not limit the justification of the act to the apparent necessity of saving the defendant's life or to prevent his receiving great bodily harm. (*Hayner* v. *People,* 213 Ill. 142, followed.)

11. SAME—*conflicting instructions should not be given.* Although it is the rule that instructions should be taken as a series

and one instruction is not required to state all the law in the case, instructions in a series should be harmonious and not conflicting.

12. SAME—*when an instruction for acquittal on ground of self-defense is improperly modified.* An instruction in a murder trial stating that the defendant's act was justifiable if he in "defense of himself inflicted upon the deceased the said mortal wound while said deceased was endeavoring in a violent manner to enter the habitation" of the defendant and his sister to offer personal violence to either or both, should not be modified by the addition of the words "and not in a spirit of revenge" after the words "defense of himself," as such modification requires affirmative proof by the defendant that the act was not done in a spirit of revenge, whereas a spirit of revenge, being one of the elements of malice, must be proved by the People.

13. SAME—*when burden is not shifted to the defendant after proof of voluntary killing.* While the burden of proving circumstances of mitigation or justification for the homicide rests upon the accused in a murder trial after the People have proved a voluntary killing, the ultimate burden of proof is not shifted to the defendant, where the proof for the People and the circumstances attending the homicide show an apparent excuse or justification for the crime; and where all the facts proved by the People show that the defendant claims to have acted in self-defense the burden rests upon the People to show, beyond a reasonable doubt, that the act was criminal.

FARMER and THOMPSON, JJ., dissenting.

WRIT OF ERROR to the Circuit Court of Jo Daviess county; the Hon. OSCAR E. HEARD, Judge, presiding.

MARTIN J. DILLON, and FISHER, NORTH, WELSH & LINSCOTT, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, HARRY C. TEAR, State's Attorney, and FLOYD E. BRITTON, (FRANK T. SHEEAN, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiff in error, Willy, was indicted and convicted in the circuit court of Jo Daviess county for the murder of Earl A. Fitch and sentenced to the penitentiary at Joliet

for life. The record has been brought to this court by writ of error.

Francis X. Willy (also called Frank Willy) was at the time of the homicide, June 19, 1919, a bachelor, fifty-four years of age, and had lived in Galena all his life, residing for the last fifteen years with his sister, Paulina Armbruster, a widow, in a home owned by her. The evidence showed that the Armbruster home adjoined the Fitch home on the south, both fronting on the east side of Bench street; that the foundation walls of the houses were parallel and about five feet apart; that the superstructures of the two buildings were continuous, giving the appearance of one building, and that the distance from these buildings to the cement curb was about eight feet, making a wide cement walk. The evidence also shows that there is an electric light pole, (sometimes called in the evidence a telephone pole,) about fourteen inches in diameter, standing at the edge of the sidewalk on the south line of the Armbruster property, twenty-two feet from the center of the front doorway of the Armbruster home; that between the foundation walls of these two homes there was a space called in the proceedings the "alleyway," the bottom of which was seven and a half feet below the level of the sidewalk and which was entered from the front by a stairway leading from the Bench street level; that the entrances from the front doors of these two houses were practically on the street level, there being but one low step to the sidewalk; that the entrance to the Armbruster home is through a storm or enclosed porch, which extends about four feet out from the front wall of the house, and that the Fitch home had a porch in front of the front door; that between this storm porch and the Fitch porch is the entrance into the alleyway between the houses, which is closed by inclined doors such as are often seen on outside entrances to cellars, and that when the door on the Armbruster side was open into the alleyway it leaned back against the storm porch; that there

was a doorway opening from the basement of the Armbruster home into the alleyway, and Mrs. Armbruster apparently used the basement for a kitchen and dining room. It would appear from the photographs offered in evidence that the ground slopes down considerably as it goes from Bench street to the back yards of these houses. It further appears from the evidence that there was no doorway from the Fitch home into the alleyway, although there is a small window opening into it; that there was a leaky spout on the Fitch property leading through this alleyway and that when it rained the water would accumulate in the alleyway; that the alleyway was used largely for storage of wood and other things by the Armbruster family, Mrs. Armbruster testifying that she claimed to own the entire alleyway space, while Mrs. Fitch stated that while the alleyway had been used largely, if not entirely, by the Armbruster family, the Fitch family claimed half the alleyway space but had never used it. The evidence shows that on account of the moist condition of the alleyway Mrs. Armbruster for several years had insisted on opening the inclined door next to her residence in order to air and dry the alleyway; that this action on her part was objected to by Fitch, who did not want the inclined door left open, and this led to sharp disputes between them, and that sometimes, the plaintiff in error claims the evidence shows, Fitch used physical force in preventing Mrs. Armbruster from keeping the alleyway door open.

The evidence shows that the deceased was thirty-nine years old, about six feet tall, erect, broad-shouldered and active, weighing from 180 to 200 pounds, and apparently very athletic and vigorous. For many years previous to his death he was employed as cashier of the Merchants National Bank of Galena. Plaintiff in error had practically all his life been a music teacher, teaching the violin, clarionet, cornet and other instruments. The evidence in his behalf tends to show that he had been in poor health and unable to perform hard labor for twenty-five years; that his music pupils

called on him at his home, where the lessons were given, and that during the six years the Fitches lived adjoining the Armbruster residence there had been complaint made to Fitch by Willy of the noise made by the Fitch and other children playing in front of his house while he was giving lessons, and that this dispute had added to the trouble over the alleyway between the families.

The evidence tends to show that on the forenoon of the day of the homicide Mrs. Armbruster opened the alleyway door on her side of the property line, and it stood open, leaning against the storm porch, when Fitch came home for his lunch at 12:30 P. M. According to the testimony given by plaintiff in error, Fitch saw the door open when he came home and slammed it down, went into his house and sat down in the front room with his cap on and picked up the paper,—according to the argument of counsel for the plaintiff in error for the purpose of seeing whether Mrs. Armbruster attempted to open the door again. Plaintiff in error testified that his sister did open the door shortly after and Fitch came rapidly out of his house and insisted on its being closed, and during the dispute over the question he violently pushed Mrs. Armbruster into the storm porch, using loud language during the discussion. Plaintiff in error heard the discussion and his sister scream and hastened toward the porch door, and seeing the physical conflict between Fitch and his sister, turned back in the house and obtained a revolver and returned to the storm porch and told Fitch to let his sister alone, pulling the revolver from his hip pocket at the same time. Plaintiff in error testified that he pulled this revolver for the purpose of frightening Fitch and making him leave off the struggle with his sister and that he took part in the struggle to protect his sister. The evidence shows that during this struggle the revolver was fired once or twice, plaintiff in error claiming that he was not firing at Fitch but that the revolver went off in the struggle between them without any intent on his part

to shoot Fitch.   Mrs. Fitch, on the other hand, testified that when her husband came home from the bank that noon he started to read the paper but went with one of his daughters to look for a ball which she had lost in the alleyway; that they did not find the ball and Fitch came in and sat down in a chair in the bay window in the front room, which extends out toward Bench street, and started to read the paper; that she was then preparing lunch and went into the kitchen to bring some of the food into the dining room when she heard two shots fired close together; that about sixteen seconds after she saw Fitch sitting in the bay window she saw him out in front of the building, on the outer side of the electric light pole, and plaintiff in error, with a revolver in his hand, moving about on the other side of the pole, his sister standing about two feet behind him; that witness ran out in front of the building, and, thinking that plaintiff in error was trying to shoot her husband from the other side of the pole, grabbed hold of him in an attempt to interfere with his aim and asked him not to shoot, and while she was struggling with him he fired the revolver again so close to her that one of her arms was slightly burned by the powder.   This bullet was apparently the one found embedded in the electric light pole after the tragedy.   Plaintiff in error's account of what happened then is as follows:  "Then he turned and ran right down to the telegraph post,  *  *  *  and then he  *  *  *  picked up a large stone and throwed it at me and missed me by about four inches to my right.   Then I shot a blow, intending not to threaten me again.   I was afraid he would come in the house after me.   He stood there about four or five seconds after the shot and showed no signs of being injured,— not by actions or words.   He didn't say a word.   Then he ran to the center of the street and down probably five or six feet farther west and picked up another stone and threw that and hit me right on the shoulder, and I shot again to intimidate him not to throw any more stones.   Then he

stood four or five seconds the same as before. Then he made a rush, and I said to sister, 'He is coming! Go on in the house!' I ran in. My sister ran in. She was ahead of me right at the storm door. She got the screen door open about that far, and that is about as far as she got. I was standing at an angle to the door where she was, and I saw Fitch right at the door and said, 'He is here,' and I turned around and he took hold of me right away. He got his arm around my neck and the other one right over here. He had my arms this way, [indicating,] and that is all I had loose. To save my life I just shot right there. We were all in the storm house. I do not know what became of the gun. Somebody took it away from me. I let go of it. I felt the pull. I never did see the gun since that time. I was still wrestling with Fitch when the gun was taken. He was choking me." Immediately after the fatal shot was fired Fitch staggered backward, Mrs. Fitch coming to his assistance and endeavoring to support him. Within a few seconds he fell in the street and expired almost immediately. According to Mrs. Fitch's version of the transaction, instead of trying to follow plaintiff in error and his sister to the storm porch door Fitch was on the way to his own home from the electric light pole when the fatal shot was fired. Plaintiff in error testified that so far as he could recollect he fired three shots and might have fired four. The weight of the evidence is to the effect that four shots were fired, and the revolver, which was picked up near the door of the storm porch and afterward turned over to the police officers, showed that four shots had been fired from it very recently. Mrs. Fitch testified that when she ran out from her house towards her husband behind the pole he said to her, "He shot me twice," and that at that time plaintiff in error was holding a revolver pointing in the direction of her husband from the opposite side of the electric light pole.

There is some controversy in the evidence as to whether or not Fitch was weakened by any wounds previous to the

time that he received the fatal wound in the last conflict be-
tween himself and plaintiff in error, the testimony of plain-
tiff in error being that Fitch was coming rapidly towards
him,—or, as he termed it, rushed towards him,—from be-
hind the electric light pole when he told his sister to go into
the house, and there is some testimony on the part of other
witnesses that Fitch seemed to be physically somewhat weak-
ened when he was behind the electric light pole.   Plaintiff
in error testified that Fitch took the gun away from him
during the last struggle at the storm porch door, and there
is other testimony which tends to support the statement that
near the close of the last struggle Fitch had the revolver
in his hand and dropped it where it was afterwards picked
up.   When arrested, shortly after the homicide, plaintiff in
error had a small scratch on the side of his nose about an
eighth of an inch in length, which was bleeding slightly, and
when questioned by the deputy sheriff after his arrest he
told the deputy that he shot to defend himself, and that
deceased had thrown two rocks, one of which had hit him
in the shoulder.   An examination of the deceased after his
death by Dr. Bench showed that there were three gunshot
wounds in his body : one about the middle of the chin, one
in the right hip, and one in the chest, just at the upper edge
of the breastbone, passing through the aorta and entering
the backbone.   The latter wound was the one that caused
his death, the doctor testifying that death came within a
few seconds,—perhaps eight or ten,—after this last shot
was fired.   The evidence of some persons who heard and
saw a part of the transaction was to the effect that plaintiff
in error after the first shots were fired followed the de-
ceased towards the street and was on the other side of the
pole from Fitch at the time the struggle took place between
him and Mrs. Fitch.

Counsel for plaintiff in error argue that the evidence of-
fered in rebuttal by the People to the effect that the gen-
eral reputation of plaintiff in error as a law-abiding citizen

for peace and quietude was bad, after it was shown by cross-examination of these witnesses upon what they based their opinion that his reputation was bad, should have been stricken out. On behalf of plaintiff in error twenty-one witnesses, citizens of Galena who had known the accused for many years and in some instances all his life, testified that his reputation for peace and quietude and as a law-abiding citizen was good. Nine witnesses for the People testified, in rebuttal, that his reputation was bad. It is argued by counsel for plaintiff in error that in no instance was the testimony of these witnesses for the People based upon anything that qualified them to testify. In several instances the one thing that had ever been discussed in their hearing, as shown by such cross-examination, was as to certain charges made against Willy twenty-five or twenty-seven years prior to the trial, one of them being that he had been arrested for indecent exposure. All of these witnesses for the State testified on direct examination, within the proper rules of law, that his reputation was bad, but on cross-examination most of them admitted they had never heard of anything that in any way showed any acts of violence on his part or concerning his reputation for peace and quietude within twenty or more years previous to the trial, and others of them had not heard anything within five or more years, and some others not within ten years, and in most instances it appeared that they had not heard, definitely, anything within twenty years previous to the trial. William G. Hodson, one of the character witnesses for the State, testified that the first he heard was in the winter of 1891-92, and that he was basing his judgment on what he had heard at that time and his own judgment of Willy and his character; that he had heard he was a law violator, perhaps ten years ago, but it was apparent from his testimony that he was relying largely on what he had heard about Willy being arrested for indecent exposure more than twenty years before the trial. H. S. Whitmore, another

character witness for the State, testified on cross-examination that he had never heard that Willy had ever been arrested on any other occasion than the one twenty-six years ago.  William Hurst, for the State, testified on cross-examination that he could not give any particular law Willy was said to have violated in the last ten years.  E. W. Montgomery, character witness for the State, testified on cross-examination that Dr. Bench, during June or July of last year, told him about Willy; that the doctor did not speak of it as being within the ten years last past that Willy had violated any law but he did say that he was not a peaceable man; that he was "a darn mean man and ought to be run out of the country."  This witness also testified that he had never heard of Willy striking anybody or using any violence towards anybody or violating any law within the last ten years.  Coradan N. Pond, another character witness for the State, testified on cross-examination that he had not heard from anybody that Willy had during the last five years committed any act of violence; that he had never heard of his violating the law during the past five years, and he added that Willy "couldn't be anything but meek, docile, even-tempered the last several years; he is too indolent."  S. H. Kittoe, Ralph N. Boswick and John J. Gantz, character witnesses for the State, testified on cross-examination substantially to the effect that nobody had ever told them that Willy had been guilty of any violence or any riotous or tumultuous conduct of any kind for a considerable number of years, except what is in this case.  Richard Dwyer, another character witness for the State, who had been a night watchman and city marshal for five or six years previous, testified to like effect.

The general rule is that the accused is entitled to introduce evidence of his good character, and if he does, the prosecution may introduce evidence in rebuttal.  Evidence of character should be confined to proof of general reputation at or prior to the commission of the offense.  It

must not be allowed to cover reputation after the commission of the offense or what was said after the offense with reference to the character of the accused either before or after the offense; and this is true both as to the evidence of good character and as to the evidence of bad character in rebuttal. The evidence should be confined to a time not too remote from the commission of the crime. (16 Corpus Juris, 580, 581; Underhill on Crim. Evidence,—2d ed.— sec. 83.) While the evidence of character should be confined to a time not very remote from the date of the commission of the crime, no certain limit in point of duration can be laid down as to such evidence. It is necessary that the evidence on the part of the accused should be confined to a time not too remote from the commission of the crime, for it would be impracticable for the prosecution in most cases to trace the life and habits of a defendant for more than a few years, and so it would be improper to allow the defendant to go back to boyhood and put in proof which it would be out of the power of the prosecution to contradict or rebut. (8 R. C. L. 209.) As a general proposition, the evidence of character should relate to the time when the character of the person will tend to illustrate the act in question. It appears to have been the early practice to prove the character of a person by the testimony of others who testified directly to his character from personal knowledge and observation. While there is some authority for proving character in this manner at the present time, such practice is unusual and against the great weight of modern authority. It is generally held that the personal opinion of a witness is incompetent evidence of either character or reputation, and that character is provable only by evidence of general reputation. (3 Ency. of Evidence, 27-35.) Evidence of specific acts of bad conduct is not admissible to show bad character. It is error to permit a character witness to be cross-examined as to his own knowledge of particular acts of bad conduct by the accused,

but a witness to good character may be asked, on cross-examination, if he has heard rumors or conversations of particular charges of the commission of acts inconsistent with the character which he is called upon to prove. (Underhill on Crim. Evidence,—2d ed.—sec. 82.) In *Justiss* v. *State,* 57 Tex. Crim. 218, it has been held that evidence of character fifteen years previous to the crime in question was too remote to be admitted. In *Richards* v. *State,* 55 Tex. Crim. 278, the court held that evidence of conviction of a witness eighteen or twenty years before was inadmissible for purpose of impeachment, the conviction being too remote. In *Shuster* v. *State,* 62 N. J. L. 521, the court held that reputation eighteen years before the crime was too remote to be admitted as evidence of character. In *Burkhalter* v. *State,* 85 Tex. Crim. 282, the court held that evidence that the accused was given to fighting and was regarded as a "holy terror" fifteen or twenty years before could not properly be admitted. In *Linz* v. *Skinner,* 11 Tex. Civ. App. 512, it was held that the introduction, for the purpose of affecting the credibility of a witness, of an indictment rendered ten years before might be objected to as too remote. In a prosecution for violation of the local option law, evidence that the defendant some eight or nine years previous to the trial had been indicted a number of times for violation of that law was held inadmissible either to prove the offense charged or to impeach defendant as a witness. (*Marks* v. *State,* 78 S. W. (Tex.) 512.) In *State* v. *Pancoast,* 35 L. R. A. 518, (5 N. Dak. 514,) the court in discussing the question of character evidence under the rule laid down in Greenleaf on Evidence, (vol. 1, sec. 459,) says, on page 533: "The examination being governed and kept within bounds by the discretion of the judge, all inquiries into transactions of a remote date will, of course, be suppressed, for the interests of justice do not require that the errors of any man's life long since repented of and forgiven by the community should be recalled to re-

membrance and their memory be perpetuated in judicial documents at the pleasure of any future litigant. The State has a deep interest in the inducements to reformation held out by the protecting·veil which is thus cast over the past offenses of the penitent; but where the inquiry relates to transactions comparatively recent, bearing directly upon the present character and moral principles of the witness, and therefore essential to the due estimation of his testimony by the jury, learned judges have of late been disposed to allow it."

Under these authorities we think the evidence of most, if not all, of the character witnesses for the State, when motion was properly made on the trial, should have been stricken, as it was clearly shown on cross-examination of such witnesses that they were testifying, in some instances, to acts too remote. While it is true that the general rule is that much must be left to the discretion of the trial court in receiving and rejecting such evidence, this evidence of the bad reputation of the accused, based on something that took place more than ten years before, with no proof to show its continuation, we think by the great weight of authority was too remote to be admitted, and the opinion as to his bad character based on such witnesses' knowledge was not properly admissible. The testimony of witnesses in a criminal case as to the defendant's reputation may be stricken out, on motion, where it is disclosed, on cross-examination, that they had no knowledge of his reputation. (*State* v. *Thoenke,* 11 N. D. 386.) While this court does not seem to have passed on this particular question, it has been held where, in answer to a proper question, a witness gives testimony which is incompetent, it is the duty of the court, on the motion of the party against whom the testimony was given, to exclude it. (*People* v. *Scattura,* 238 Ill. 313.) As we understand the record, objection to the testimony of the character witnesses for the State was made specifically only as to two of these witnesses. As

to those witnesses the objection should have been sustained when it appeared on cross-examination that their testimony as to the bad character of the plaintiff in error was based on acts too remote to be admitted or upon their own personal belief as to his bad character. The same rule would apply to the other witnesses whose testimony as to character was based on acts more than ten years prior to the homicide.

Objection was made to the testimony of the witness Richard Dwyer, city marshal of Galena, as to what he said to plaintiff in error when he placed him under arrest in his home after the homicide. He stated that he found plaintiff in error eating lunch in the kitchen and he asked witness if he could not finish his lunch, and the officer said, "We had better hurry up; there was quite a crowd gathering outside; we had better get away as quick as we could." Objection was made by counsel for plaintiff in error to the admission of this last statement and overruled. The objection to this quoted statement of the marshal should have been·sustained. We can see no reason for holding it was admissible. It had no direct bearing of any kind on the question of the guilt or innocence of plaintiff in error. Its only purpose could have been to suggest that there was a mob or might be danger of mob violence because of the act of plaintiff in error. Whether or not there was any danger of mob violence could have no bearing, one way or the other, on the issues involved in this case, and it has been held that it is improper to receive evidence of threats of a mob to lynch the accused. *State* v. *Sneed,* 88 Mo. 138.

Counsel for plaintiff in error also argue that the court erred in permitting Mrs. Fitch to testify as to certain things that occurred at the time of the homicide, and to state, among other things, over objection of counsel for plaintiff in error, that when her husband was standing on the opposite side of the electric light post from plaintiff in error he said to her, "He shot me twice." It is argued by coun-

sel for the State that this statement of the widow as to what deceased said to her during the transaction was admissible as a part of the *res gestæ,* while counsel for plaintiff in error insist that it was a mere recital by the deceased to his wife as to what had happened theretofore; that this statement was made by the deceased before he was mortally wounded, and was not his dying declaration or any part of the *res gestæ. Res gestæ* has been defined as "those circumstances which are the automatic and undesigned incidents of a particular litigated act and which are admissible when illustrative of such act." (1 Wharton on Evidence, sec. 258.) The "ground for the admissibility of such declarations is that they are the natural and spontaneous utterance of the declarant so closely connected with the transaction in question as to be, in effect, a part of it, there having been no opportunity for premeditation or design." (1 Elliott on Evidence, sec. 538. See, also, to the same effect, *McMahon* v. *Chicago City Railway Co.* 239 Ill. 334; *DiPrisco* v. *Wilmington City Railroad Co.* 4 Pen. 527; *Kenney* v. *State,* 79 S. W. (Tex. Crim. App.) 817; and see 11 Ency. of Evidence, 300, 314, incl. and cases there cited.) "In other words, they must stand in immediate causal relation to the act and become part either of the action immediately producing it or of the action which it immediately produces. Incidents that are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations, become in this way evidence of the character of the act. Under the rule before us, evidence in homicide trials has been received of the exclamations of the defendant at the time of the attack; of the cries of the deceased and of others assaulted at the same time; of statements of the deceased at the time or so soon before or afterwards as to preclude the hypothesis of concoction or premeditation, charging the defendant with the act. * * * On the same principle the cries of a mob led by parties tried for riot and unlawful meeting can be

received against the defendants, no matter at what time during the continuance of the riot such cries were uttered, but the comments and criticisms of such observers cannot be introduced as *res gestæ*." (Wharton on Crim. Evidence,— 1884 ed.—sec. 263.)

In discussing the reason why the courts have held statements admissible as part of the *res gestæ*, it has been said that they are not strictly exceptions to the rule against the admission of hearsay testimony. That fundamental requisite is lacking in this class of cases. "On the other hand, they clearly do involve the testimonial use of the assertion to prove the truth of the fact asserted,—for example, when the injured person declares who assaulted him, or whether the locomotive bell was rung, or whether the bystander at an affray exclaims that the defendant shot first. Such statements are genuine instances of using a hearsay assertion testimonially,—*i. e.*, we believe that Doe shot the pistol or that the bell was rung, because the declarant so asserts, which is essentially the feature of all human testimony. There was a time when the state of the judicial precedents was such that no established exception of this tenor could yet be said to exist. * * * Since the courts actually do admit a class of statements to which prohibition of the hearsay rule applies, since we must shape our treatment of the law of evidence by what the courts do and not by what they say, the time seems to have come to call those doings by their true name,—in other words, to recognize the existence of this exception to the hearsay rule. The limits of the exception may be elusive and the practice in different courts may vary, but that the core and substance of such an exception is universally accepted cannot be open to doubt." (3 Wigmore on Evidence, sec. 1748.) This author in the same section states: "Whenever, therefore, an utterance of a witness is used as testimony that the fact asserted in it did occur as asserted,—*i. e.*, on the credit of the speaker as a credible person,—it is being used testimoni-

ally and is within the prohibition of the hearsay rule." In *State* v. *Pomeroy,* 25 Kan. 242, the court held that the declarations of the injured person made in the absence of the accused from three to five minutes after the transaction to a witness who ran to his assistance on hearing his cries of murder, that the accused had made the assault with a musket, was not admissible, as it was mere hearsay. In *Regina* v. *Redingfield,* 14 Cox's Crim. 341, on an indictment for murder, it appearing that the deceased, with her throat cut, came suddenly out of a room in which she left the prisoner, who also had his throat cut and was speechless, and that she said something immediately after coming out of the room and a few minutes before she died, the question being whether it was murder or suicide, the court held that her statement was not admissible either as a dying declaration or as part of the *res gestæ.*

While the authorities on the question as to whether the statements made by the deceased at the time of the homicide could be admitted as a part of the *res gestæ* are not always in harmony, yet it is clear that the question is decided largely on the particular facts connected with each case. We are disposed to think that on reason and authority the statement of the deceased, in the hearing of his wife, that "he shot me twice," under the circumstances of the case could hardly be considered part of the *res gestæ,* but it did not amount to reversible error, as the weight of the evidence in the record quite clearly shows that plaintiff in error had fired two shots before Fitch made the statement to his wife that "he shot me twice."

Counsel for plaintiff in error also argue that the trial court committed error in the rulings on the cross-examination of Mrs. Fitch in some particulars, among others that she was not permitted to answer the question, "Now, you and your husband both had very intense feeling against Mr. Willy and Mrs. Armbruster, did you not, at that time?" And another question, "Now, at that time, and for some

time prior, did your husband have a feeling of ill-will towards this defendant and his sister?" Objection to both these questions was sustained. The bad feeling between plaintiff in error and the deceased, as well as between the other members of the two families, was so fully proven by the evidence that we cannot see how the refusal to answer these questions in any way injured plaintiff in error.

Neither do we think the trial court committed error in refusing to permit Mrs. Fitch to answer this question put to her by counsel for plaintiff in error, "Do you know why the State's attorney wanted you in the court room?" We do not see how this last question is competent. Even if the State's attorney had given her any reason why she should remain in the court room, we cannot see what bearing it could have had upon the issues involved in this proceeding.

Neither do we think there was any error in the court's ruling with reference to the testimony of Ellsworth Binninger, who testified to a conversation he had with plaintiff in error that plainly showed he had had trouble with the Fitches and did not like them, during which talk he said, "I am going to shoot him." It is argued that this last statement was improper to be admitted. It is claimed that this conversation is shown to have occupied about half an hour, and that a reading of the record will show it is not clear that when plaintiff in error made the statement, "I am going to shoot him," he was referring to Fitch. A reading of the record, in our judgment, shows with satisfactory clearness that plaintiff in error was referring to the deceased when he said, "I am going to shoot him." There was therefore no error in the ruling of the court in refusing to strike out this testimony of Binninger on motion of plaintiff in error.

Counsel for plaintiff in error also argue that error was committed by the trial court in its rulings as to the evidence of Joseph Dimpke. It appears that during one of the disputes between Fitch and Willy with reference to the alley-

way door and the rights of the two households to the alley-way, Willy had gone to Dimpke, a justice of the peace, to swear out a complaint to put Fitch under a peace bond. Dimpke, while on the witness stand, admitted that such an application had been made to him and that the complaint was made out, but testified that he could not find it among his files and thought the complaint and warrant had been burned; that he had not docketed the suit but had made a search for the papers and could not find them. He was then asked by counsel for plaintiff in error to state the substance of the complaint. Objection to this question was sustained by the trial court. It is urged that in order to show good faith on the part of the accused in making this formal charge against the deceased it was material to allow the witness to testify as to the substance of the complaint. The fact that plaintiff in error swore out such a warrant before the justice against the deceased was admitted, and we do not see how the refusal to allow the witness to testify as to the substance of the complaint could have materially injured the issues as to plaintiff in error in this trial, or that to make proof as to the terms of the complaint would in any way support plaintiff in error's position that he was acting in good faith in the dispute between deceased and himself over the alleyway, or that proof of its terms would in any way tend to offset the charge of malice made by the State in its prosecution.

It is also insisted that the court erred in refusing to allow Dimpke, the justice of the peace, to answer the question asked of him by counsel for plaintiff in error, "Did you receive any instructions pertaining to that trial from any official source?" and the further question whether he had talked with the State's attorney about it. Objections to both questions were sustained. It is insisted by counsel for plaintiff in error that if Dimpke had been permitted to answer the question whether he had talked with the State's attorney and the latter had refused to prosecute the

case, and that fact had been communicated to plaintiff in error, it would have strongly tended to uphold plaintiff in error's contention that it was not because he was moved by malice, but to protect himself, that he as a last resort had bought the revolver to protect himself.

This question was asked of Dimpke by counsel for accused, "Did Mr. Willy say anything to you about his being afraid?" and objection thereto was sustained. It is earnestly argued that this last question was clearly competent, because if plaintiff in error had made the statement to an officer of the law that he was afraid it would tend strongly to show that the purchase of a revolver would not be proof of malice, because such purchase would be the only course he could take to defend himself when the public officials had advised him that he could not be protected by them against the alleged threats of the deceased. We are inclined to think a very wide latitude should have been allowed counsel for plaintiff in error to prove the attempt plaintiff in error had made before the justice of the peace as well as any information that had been furnished him with reference to his prosecution to put Fitch under peace bonds, and we are of the opinion that the court erred in limiting as strictly as it did the cross-examination of Dimpke with reference to these questions.

It is further argued by counsel for plaintiff in error that the trial court erred in permitting attorney Sheean, who was acting as assistant State's attorney, to read from a piece of paper certain testimony in his closing argument to the jury, over the objection of the plaintiff in error. On the objection to his action in that regard he stated in open court, "This is my memorandum of the testimony," and the court refused to sustain the objection to his reading from the written memorandum held in his hand. In 16 Corpus Juris (sec. 2237) it is stated that the general rule is that an attorney may refresh his recollection by reading from the official transcript of the court reporter, and the authorities

cited there support this statement. This court does not seem to have ruled on this precise question. To permit counsel to read to the jury from the transcript written up by the shorthand reporter or from the attorney's own memorandum would tend to over-emphasize the testimony of the witness which is thus re-read. In our judgment, permitting attorneys to read from the transcript of the evidence taken by the shorthand reporter, or otherwise, should not be approved. If there is any dispute between attorneys as to what a certain witness testified to, the trial court should not attempt to settle the dispute by allowing the reading from the transcript of the evidence made by the shorthand reporter or by anyone else, but should allow the jury to pass upon and decide what the witness really testified to. The trial court erred in permitting attorney Sheean to read, over objection, from the memorandum in question.

The chief argument of counsel for plaintiff in error in their briefs is, that while the verdict convicted plaintiff in error of the crime of murder the evidence does not sustain the verdict, for the reason that it does not prove such malice as would constitute murder. They argue that the testimony of plaintiff in error himself, supported by the surrounding circumstances and the weight of the testimony of other witnesses, justifies the conclusion that plaintiff in error was right in believing that it was absolutely necessary to shoot the deceased to save himself or his sister from a vicious assault or to prevent the deceased from entering his home to assault him or his sister; that while, ordinarily, these questions are facts to be determined by a jury, a situation may arise, as it is alleged it does here, which would require the court to take away from the jury the right to decide whether the person is guilty of murder where the evidence was so irresistible as to satisfy all reasonable minds that the homicide was justifiable under the rules of law. We cannot agree with counsel for plaintiff in error that the

court should have instructed the jury that the homicide was justifiable, under the law, on the facts in this case. That question should have been left to the jury under proper instructions.

Counsel for plaintiff in error further argue that the right of defense of home and habitation is the greatest of all rights; that the trial court in the rulings, and particularly with reference to instructions given and refused, ignored this right of defense of home and confused it in these instructions with the right of self-defense of person. An examination of the instructions complained of, in our judgment, shows that they do not present a connected or consistent theory of the rights of the accused in defense of his habitation. That subject has been frequently discussed by the authorities. This court in *Hayner* v. *People,* 213 Ill. 142, in a case where the facts were somewhat similar to those here, gave a very clear and illuminating discussion on the question, quoting with approval from *Davison* v. *People,* 90 Ill. 221, the statement that "a man's house is his castle, and he may defend it even to the taking of life, if necessary or apparently necessary to prevent persons from forcibly entering it against his will and when warned not to enter and to desist from the use of force;" and the court, after quoting that doctrine from the *Davison* case, continued (p. 151) : "We think, also, the general rule is, that a person within his own house may exercise all needful force to keep an aggressor out, even to the taking of his life. A man in his own habitation may resist force with force and oppose an unlawful entry against his will by one who in a violent manner attempts to enter with a purpose of assaulting or offering violence to him, even to the extent of taking life, although the circumstances may not be such as to justify a belief that there was actual peril of life or great bodily harm." The rule as thus laid down has been generally followed by courts in other jurisdictions,

and we see no reason to attempt to further elaborate here with reference thereto in a general discussion as to the right of defense of habitation. ·

Instruction 17 given for the People, in discussing the rule of law that applies to the killing of a human being when the question of self-defense or the defense of habitation, property or person is involved, says among other things: "That if a person kill another in self-defense, it must appear that the danger was so urgent and pressing that in order to save his own life, or prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and it must appear also, that the person killed was the assailant, or that the slayer had really and in good faith, endeavored to decline further struggle before the mortal blow was given." While the first part of this instruction referred to self-defense and the defense of habitation or property, the quoted part refers specifically only to the question of self-defense of person, and in view of the special facts in this case it was not applicable to the question of defense of habitation. The entire instruction, taken together, and especially the quoted part, would tend to cause the jury to believe that even on the question of defense of habitation it must appear to the accused that the danger was so urgent and pressing that in order to save his own life or prevent his receiving great bodily harm the killing was necessary. This is contrary to the rule laid down in the *Hayner case, supra.* This view in the instruction is so interwoven with both the questions of self-defense and the defense of habitation that it could not but tend to cause the jury to believe that before the accused was justified in shooting in defense of habitation he must have believed that the shooting was necessary to save his own life. Not only is this rule contrary to that laid down in the *Hayner case, supra,* but it is also contrary to the reasoning of this court in *People* v. *Forte,* 269 Ill. 505. We think instruction 18 given for the People is also subject for the same reason to like criticism.

Instruction 19 given for the People told the jury that "the right of self-defense does not imply the right of attack in the first instance, nor does the right of self-defense or defense of habitation permit of action done in retaliation or in revenge." This instruction, in our judgment, failed to clearly distinguish between the right of defense of person and right of defense of habitation and ignored the right of defense of habitation. It also told the jury that if the plaintiff in error shot and killed the deceased in a spirit of utter disregard of human life or from motives of revenge then the defense of habitation would not be available to him. In this regard it is not in accord with the reasoning of this court in *People* v. *Hayner, supra,* and authorities there cited.

Instruction 20 given for the People states, among other things, that "if the People of the State of Illinois in this case have proven by the evidence beyond a reasonable doubt, each and every one of the following facts, you should find the defendant guilty of murder. [Here stating the facts.] That said killing was not done in the act of necessary self-defense, or in defense of habitation, property or person as such defenses are defined in these instructions." It is conceded by counsel for the State that this instruction, if it did not contain the last quoted clause, "as such defenses are defined in these instructions," would be erroneous in saying that the killing, to avoid being murder, must be done "in the act of necessary self-defense," for it is not the law that self-defense shall not be available unless the shooting was necessary, for a person may be justified in shooting in self-defense if the circumstances make it "appear to him to be necessary." It is argued by counsel for the State that the added words in said instruction, "as such defenses are defined in these instructions," so modified this instruction in regard to the use of the words "necessary in self-defense" that it was not erroneous. Beyond question it is the rule that instructions in a case should be taken as a series, and

one instruction is not required to state the whole law in itself; (*Lilly* v. *People,* 148 Ill. 467;) but it is also the rule that instructions that are not in harmony, one being correct and the other incorrect, should not be given, as it cannot be told which instruction the jury followed. (*People* v. *Scott,* 284 Ill. 465.) It is obvious, also, that instructions taken as a series should be harmonious and not conflicting. We do not think the doctrines of self-defense of person and defense of habitation were so clearly set up in this series of instructions that the jury would not be misled by instruction 20 as given, and, as already stated, the instruction did not clearly distinguish between the defense of person and the defense of habitation.

Counsel for plaintiff in error also insist that the court committed error in modifying instruction 29 offered on behalf of plaintiff in error, which, as offered, attempted to set out that if the accused, in the reasonable "defense of himself, inflicted upon the deceased the said mortal wound while said deceased was endeavoring in a violent manner to enter the habitation of Mrs. Armbruster for the purpose of assaulting or offering personal violence, either to the defendant or to Mrs. Armbruster or both," then the killing was justifiable. This instruction was modified and given with the modification by inserting immediately after the words "defense of himself," the words "and not in a spirit of revenge." It is insisted that the insertion of these last words in this instruction took away from the accused the right to defend himself even in the face of great danger to his life or great bodily harm to himself, and that this modification led the jury into a consideration of the law of self-defense and away from the law pertaining to the defense of home and habitation; that from this modification, along with other instructions, the jury would understand that they must not consider whether the killing was justifiable on the ground that the killing was in defense of his habitation while the deceased was endeavoring in a vio-

lent manner to enter the plaintiff in error's habitation, and that if the plaintiff in error was in any way influenced by a spirit of revenge at the time he fired the fatal shot because of the trouble he and his sister had had with the deceased, defense of habitation or person could not be urged in his behalf in this cause. We think this instruction, as well as others in the series, might lead the jury to believe that the accused would not be justified or excused in committing the homicide in defense of his home or habitation if he did not prove, affirmatively, that the shooting was not done with any spirit of revenge. So far as the spirit of revenge is involved, as inserted in this and other instructions, in our judgment it was one of the elements of malice, and malice must be proven by the People as part of its case.

The wording of People's instruction 7 on the question of burden of proof, in our judgment might also have misled the jury on that point. By that instruction the jury were told, among other things, that "the killing of Earl A. Fitch having been proved by the prosecution, the burden of proving circumstances of mitigation, or that justify or excuse the homicide, devolves upon the accused, unless the proof on the part of the prosecution sufficiently manifests that the crime committed only amounts to manslaughter, or that the accused was justified or excused in committing the homicide." While the rule of law is that the burden of proving circumstances of mitigation or justification for the homicide rests upon the accused, still the law does not require that in such a case as this the burden of proof "is shifted by proof of a voluntary killing, where there is excuse or justification apparent on the proof offered in support of the prosecution or arising out of the circumstances attending the homicide." (*State* v. *Patterson*, 12 Am. Rep. 200; 45 Vt. 308.) In the opinion in that case there is an exhaustive discussion upon the question of burden of proof with citation of numerous authorities, and we think the conclusion must be reached from that discussion, that

on the trial on an indictment for homicide, where all the facts proved by the prosecution show that the defendant claimed to do the act resulting in death in self-defense, the burden rests upon the prosecution to show beyond a reasonable doubt that the act was criminal. Instruction 7 on the point of burden of proof was so worded as to mislead the jury.

Counsel for the State argue that even though errors were made in some of the instructions on the points argued, plaintiff in error was so clearly proven guilty that the judgment ought not to be reversed because of erroneous instructions. The accused had the right to have the evidence of all the circumstances in the case considered by the jury for the purpose of deciding whether or not the deceased attempted to enter the home of plaintiff in error and his sister for the purpose of violently assaulting him or his sister, and whether or not the accused, in firing the fatal shot, was reasonably resisting such entrance. In our judgment the giving of the erroneous instructions may have seriously prejudiced the plaintiff in error.

Other questions are urged in the briefs, as to which, after examination, we do not think reversible error was committed, and it is needless to further extend this opinion to discuss them in detail. What we have said, in our judgment, will sufficiently advise counsel and the court with reference to the rules of law that should govern on the re-trial of this case.

For the errors indicated the judgment of the circuit court will be reversed and the cause remanded.

*Reversed and remanded.*

FARMER and THOMPSON, JJ., dissenting.