Dennis **SHERROD**, Appellant,

v.

**UNITED STATES, Appellee.**

No. 83–1565.

District of Columbia Court of Appeals.

Argued Oct. 26, 1983.

Decided June 6, 1984.

Timothy Deforest Junkin, Washington, D.C., for appellant.

Craig N. Moore, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, and Michael W. Farrell, John R. Fisher, and William D. Nussbaum, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FERREN, BELSON and ROGERS, Associate Judges.

ROGERS, Associate Judge:

Appellant was convicted by a jury of murder in the first degree while armed (D.C.Code §§ 22–2401, –3202 (1981)) and assault with intent to kill (*id.* §§ 22–501, –3202). He seeks reversal of his convictions on the grounds that the prosecutor's conduct in examining witnesses and closing argument denied him a fair trial; the trial judge erred in allowing inadmissible hearsay into evidence through a detective's testimony about two conversations with the surviving victim and through a witness' written statement to the police; the trial judge's revocation of his bond during trial had a prejudicial and chilling effect on the fairness of his trial; and the trial court erred in refusing to allow defense counsel to read from the trial transcript during his closing argument.[1]

We conclude after reviewing the record, Part I, that neither the prosecutor's conduct in examining witnesses nor his closing argument amounts to misconduct warranting reversal. Our discussion of the prosecutor's closing argument, Part II, does indicate certain misconduct, but none so substantial as to require reversal; nor do we find, as appellant urges, that the cumulative effect of the prosecutor's conduct was plain error. With regard to the hearsay objections, Part III, we hold that the identification testimony was admissible under an exception to the hearsay rule, but the testimony recounting the victim's description of the assaults and the witness' police report were inadmissible prior consistent statements; their admission was not reversible error, however, in view of the witnesses' testimony, which was subject to cross-examination, and other circumstances indicating the reliability of the statements. We also find, Part IV, no prejudice to appellant as a result of the revocation of his bond at

---

1. Appellant also argues that his sentence should be vacated and his case remanded with instructions to resentence him on the ground that the trial judge erred in concluding that he had no discretion to sentence appellant to probation upon his conviction for first degree murder. This court considered and rejected that argument in *Beale v. United States,* 465 A.2d 796, 807 (D.C.1983). In discussing the District of Columbia's first degree murder statute, the court noted that Congress has consistently recognized that first degree murder must be punished by the harshest penalty allowed by law.

We conclude it would be impossible for this court in the face of such Congressional action

to authorize a sentencing judge who sentences a first degree murderer to life imprisonment then to suspend execution of this sentence and to place such defendant on probation .... [W]e, nevertheless deem the Congress to have fixed the severity of the sentence for first degree murder in recognition of the uniqueness of the crime and we must treat such Congressional action as conclusive.

*Beale, supra,* 465 A.2d at 806. We note that appellant filed his main brief on May 23, 1983, before *Beale* was decided on June 20, 1983; the government relied on *Beale* in its brief and appellant did not attempt to distinguish it in his reply brief.

the close of the government's case. Upon review of the trial judge's denial of defense counsel's request to read from the trial transcript during his closing argument to the jury, Part V, we decline to adopt a per se rule prohibiting such a practice, but find no prejudice to appellant and no abuse of discretion in this case. Accordingly, we affirm the judgments of conviction.

## I.

### The Government's Evidence

On October 14, 1981, Gary Primrose received a letter informing him that his job application as a maintenance worker at Howard University had been accepted. He wanted to celebrate and that evening went to see his old friend Donald Moon about having a drink. Moon, who had won the numbers lottery, suggested they buy some heroin, being occasional users, and offered to pay. The two men then proceeded in search of a seller. At 14th and U Streets, N.W., a friend of Moon's joined them and they eventually approached a man who was standing in front of a Wings & Things carryout. Moon bought "two quarters" of heroin from him. After injecting the heroin at an "oil pad" and discovering that the drugs had very little effect, they decided to try to get their money back, and returned to 14th and U Streets. They found the man who had sold them the drugs where they had left him a half hour earlier; that man, standing in front of the carryout, was Steve Gordon.

Gordon testified that earlier in the evening he had gone to 14th and U Streets and approached appellant, who was standing on the street, about "some work." Gordon had known appellant, nicknamed "Chico," for about a year as a result of prior drug transactions at 14th and U Streets. Appellant agreed to let Gordon sell some heroin, and told him to go to the corner of 13th and W Streets, where "someone would come and see [him]." Gordon did so, and after he waited approximately ten minutes, someone unknown to him walked by and dropped a package at his feet. The package contained five "quarter" bags of heroin. Gordon injected one of the bags, but found that the heroin had almost no effect on him.

When Primrose, Moon and his friend returned to 14th and U Streets, Moon told Gordon that the heroin was "no good" and they wanted their money back. Gordon said they would have to check with "the dude across the street." Primrose recognized "the dude" as "Chico," whom he had known in high school. Gordon crossed the street to speak to appellant and then relayed to the three men that appellant said they could get their money back if they went into the alley with him. Gordon warned them not to go into the alley, but they went anyway. As Primrose, Moon and his friend entered the alley, appellant beckoned to "one of his buddies" to follow him.

According to Primrose, after they went past a bend in the alley, appellant turned and punched Moon in the face, knocking him down and saying "Yes, you want me to straighten it up? I am straightening it up." Appellant and two or three of his friends continued to beat Moon, and shortly thereafter, someone hit Primrose in the face and knocked him down. Appellant also came over and started punching him and Primrose became aware that appellant was stabbing him. One or two minutes later, Gordon, who had waited across the street from the alley, saw Moon's friend run out of the alley; three to five minutes after that Moon emerged from the alley, bleeding from the stomach. At that point Gordon left the area. Primrose "hobbled" out of the alley shortly thereafter and collapsed beside Moon who was lying on the street. They were eventually taken to Washington Hospital Center where Moon died at 10:30 p.m. that night.

The same night, between 9:30 p.m. and 10:00 p.m., Primrose told Homicide Detective Kilcullen that four men had stabbed him and he knew one of them as "Chico." Primrose was in the critical shock-trauma

unit of the hospital and the interview had to be cut short because he was groaning in pain; he had been stabbed four times, his eyes were swollen and rolling and intravenous tubes were attached to his body. Two days later, Detective Kilcullen interviewed Primrose again. He was still in intensive care but recovering, although the intravenous tubes were still attached to his body. Primrose identified appellant from an array of ten photographs.[2] Appellant was arrested two days later in a vacant lot next to the Wings & Things carryout on 14th Street; a knife was recovered from his rear pants pocket.

The Deputy Medical Examiner, Dr. Kim, performed an autopsy on Moon's body and testified, as an expert in forensic pathology, that the cause of death was multiple stab wounds. He found ten stab wounds in Moon's body, eight of which were between ¾ and 1 inch wide. In his opinion, all ten of Moon's stab wounds could have been caused by a knife with the same dimensions as the knife recovered from appellant.[3] Dr. Kim also found a contusion on Moon's face but no indication of wounds which would have resulted from Moon trying to defend himself. Dr. Kim detected a small amount of morphine, alcohol and quinine in Moon's body, which indicated he had injected heroin, and found track marks on Moon's arm, from which Dr. Kim concluded Moon was a drug addict.[4]

## The Defense Evidence

Appellant's defense was a combination of innocent presence and misidentification. Two of his friends testified they saw appellant in the alley on the night of the murder, but denied he had been involved with the assaults on Moon and Primrose. Appellant's mother and father testified that appellant lived at home and had often left the knife, which was on him when he was arrested, on his bureau at home; his mother also testified she had not noticed any tears or blood stains on his clothing when she did his laundry for the week in which the murder occurred. Appellant testified that he was in the alley on the night of the murder playing craps but did not know much about the assaults other than that he was not involved.

Darian Patterson, a good friend of appellant's, testified that he had accompanied appellant in his search for a crap game and was with appellant in the alley where the murder occurred. They had gone into the alley to gamble in a dice game with ten or fifteen other people. According to Patterson, after about an hour, and while appellant was intent upon the game, Patterson saw two men, Moon and "Penrose," approach the game.[5] One of the players in the crap game stood up and confronted the newcomers. Cursing followed and one of the newcomers, Moon, punched the player in the face and knocked him down. When he fell, three of his friends, who had been

2. Prior to trial, Primrose identified appellant at a lineup and identified Gordon from a photograph as the man from whom Moon had bought heroin. Gordon also identified appellant from a lineup photograph.

3. Appellant's knife was 3¾" long, with a blade ¼" wide. Dr. Kim testified that the size of Moon's wounds were consistent with the impact of a knife with a blade ¼" wide, noting that such a knife could cause a wound deeper than 3¾" as well as wider than ¼", in the process of pulling the blade out of the body. Five of Moon's wounds were exactly ¼", three were approximately 1" wide.

4. Gordon and Primrose were cross-examined about their drug use in general and their intoxi-

cation on the night of the murder. They were also impeached by prior convictions, Primrose for possession of implements of crime in 1979, and Gordon for grand larceny in 1982 (for which he was on parole when he testified in this case) and second degree burglary and attempted robbery in 1976.

5. Patterson testified one man was wearing a baseball cap and dark sunglasses, and both were about 5' 11". Ligon, another defense witness, testified that one of the two men who approached the game had on a cap and sunglasses; the other stuttered and was approximately 5' 5", 140 pounds. Primrose had testified that he had been wearing a hat that night, and a picture of his hat, which was found in the alley, was shown to the jury; it was not a baseball cap.

gambling, pulled out knives (about five to six inches long) and began stabbing Moon and "Penrose." Then the player who had been knocked down got up and pulled out a gun. At that point, Patterson tapped appellant on the shoulder and they, and everyone else, ran out of the alley, leaving Moon and "Penrose" on the ground. The cross-examination recounted the details of the assaults and Patterson testified that Ligon, Poole, Williams and Witherspoon were also in the alley that night, but he could not remember who else was there.[6]

Harold Ligon testified that he and appellant had gambled together for a couple of years. Ligon said he was already in the crap game on the night of the murder when appellant and Patterson had joined the game. Sometime later, according to Ligon, two other men approached the game and as they did, one of the players in the game stood up and punched the shorter newcomer, Primrose, and knocked him down. Primrose, cursing and stuttering, sat up and pulled out a gun. Three of the player's friends grabbed the taller newcomer, Moon, and pulled out knives. Ligon then left the alley. On cross-examination he described the details of the assaults, and changed his testimony about who else was in the alley, claiming he was confused.[7]

Appellant testified he was 24 years old, lived with his parents and two sisters, had completed the eleventh grade and had been doing maintenance work for a man in the neighborhood in October of 1981. He knew Primrose from high school where they had played basketball; they were not close friends, but held no grudges. Since high school he had only seen Primrose every other month on 9th Street, 14th Street, and Georgia Avenue.

Regarding the night of the murder, appellant testified he was in the alley to play craps, but had not seen Moon or Primrose and did not see the assaults. He explained that when an argument had started, he was focusing on the crap game, having won over four hundred dollars. When he looked up he saw some people in the alley "wrestling," but he did not see anyone get hit. As everyone else began to run out of the alley, he picked up all of the game money and then ran out too. On cross-examination, he denied the truthfulness of Primrose's and Gordon's testimony and claimed the arresting officer was wrong about finding a knife in his back pocket, as he kept it in his waist. He also claimed he did not know Gordon.

## II.

■ Appellant alleges a variety of errors regarding the conduct of the prosecutor in questioning witnesses, offering certain evidence, and closing and rebuttal arguments. He contends the prosecutor asked his witnesses leading questions, badgered appellant on cross-examination, and grossly misstated and distorted the evidence with the result that appellant was denied due process of law and a fair trial. Our review of the record indicates that only four allegations of error merit discussion: the prosecutor's effort to elicit testimony about fear of appellant, the prosecutor's reference to two defense witnesses who did not testify, alleged inflammatory questioning, and the closing arguments. Other allegations of error relating to the scope of examination and leading questions are matters within the sound discretion of the trial court, and we find no abuse of discretion. We first address separate allegations of error, then the closing arguments and con-

**6.** Patterson admitted, on direct and cross-examination, that he had previously been convicted for second degree burglary in 1982.

**7.** On direct examination he testified that Williams was in the alley, but on cross-examination he first stated that Poole and Witherspoon were in the alley, then changed his mind and finally said that he did not know who was in the alley

that night other than appellant and Patterson. In rebuttal, the government offered a stipulation of the parties that Witherspoon was in jail on the evening of the murder.

On direct and cross-examination, Ligon admitted he had been convicted of armed robbery in 1981 in Maryland.

clude with a discussion of the impact of the prosecutor's conduct on appellant's right to a fair trial.

### A.

 Appellant has emphasized in his claims of error the prosecutor's injection into the trial of the government witnesses' fear of appellant. One example is illustrative. He contends that the prosecutor's attempt to elicit testimony from Gordon that he was afraid of appellant was improper. Before testifying, and out of the presence of the jury, Gordon had appeared with his attorney to request a ruling on whether he had waived his Fifth Amendment privilege against self incrimination by testifying before the grand jury; he intended to assert the privilege and refuse to testify in appellant's case. When the trial judge ruled that he had waived the privilege, Gordon's attorney asked the trial judge to order him to testify, in the presence of appellant, under penalty of contempt, which the trial court did. The prosecutor did not mention the incident during his direct examination of Gordon. However, on cross-examination defense counsel asked Gordon when he had contacted an attorney concerning his testimony and whether his attorney had come to court with him that day. No explanation of the reason Gordon had contacted a lawyer was given. On redirect examination the prosecutor asked Gordon several questions in an attempt to elicit that he had contacted a lawyer because he was afraid to testify against appellant and sought to avoid doing so. When defense counsel objected to the prosecutor's question of why Gordon had con-

tacted a lawyer, the trial court ruled that defense counsel had brought up the subject and the prosecutor could probe the area. This was correct, *Johnson v. United States*, 298 A.2d 516, 518 (D.C.1972), and thus the evidence was properly before the jury.

 The government concedes, however, that certain questions by the prosecutor were gratuitous, although not plain error. In asking appellant whether Primrose had lied when he identified appellant as one of his assailants, the prosecutor referred to Primrose not "know[ing] whether he was going to live or die," and testifying in front of appellant while his friends were in the witness room. There was evidence before the jury that Primrose was in intensive care after the attack, but no evidence that he was, in fact, near death. The prosecutor's reference to appellant's friends in the waiting room implied that Primrose had identified Patterson and Ligon. We agree that the questions do not constitute plain error. While an objection might have been sustained,[8] appellant did not object to them at trial and their allowance was not an abuse of discretion. *Harling v. United States*, 382 A.2d 845, 847 (D.C.1978). Contrary to appellant's contentions, the questions were not without evidentiary basis. *King v. United States*, 125 U.S.App.D.C. 318, 329, 372 F.2d 383, 394 (1967) (error for prosecution to make assertions of fact to the jury, in form of question, without basis in evidence).

 Appellant also argues that despite a sustained objection, the prosecutor's questions concerning appellant's failure to call two witnesses (Poole and Witherspoon)

---

**8.** This court recently stated that cross-examination which recapitulates earlier testimony and culminates in the witness' response that he is truthful and the contrary witnesses are lying is inappropriate because "one witness may not express a view or an opinion on the ultimate credibility of another witness' testimony." *Carter v. United States*, 475 A.2d 1118 at 1126 (D.C.1984). The authorities relied on in *Carter* make it clear that a witness, whether expert or lay, may not state an opinion on another wit-

ness' credibility since the issue of credibility is for the trier of fact. *See, e.g.,* Lilly, *An Introduction to the Law of Evidence,* § 29 at 87 (1978); *Kenion v. United States*, 302 A.2d 723, 724 (D.C.1973) (credibility for trier of fact). However, since *Carter* speaks of a prospective prohibition against this manner of questioning, noting that the practice of recapitulation on cross-examination has been permitted by the trial court, our review here is for abuse of discretion and prejudice.

were improper and require that his conviction be reversed. It is improper, under some circumstances, for a prosecutor to ask a defendant what his missing witness' testimony would have been. *See Thomas v. United States,* 447 A.2d 52, 58 (D.C. 1982) (citing *Graves v. United States,* 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021 (1893)). We find no error insofar as the prosecutor was entitled to ask appellant who was in the alley since the defense witnesses, Patterson and Ligon, had contradicted each other about whether or not Poole and Witherspoon were in the alley. But when the prosecutor asked what Poole's and Witherspoon's testimony would have been and why they were introduced at voir dire as defense witnesses (to which the defendant gave no answer), the trial judge properly sustained the defense objection. In the absence of a prior ruling on missing witnesses by the trial court, it would be improper for the prosecutor to pursue questioning which would suggest to the jury that their testimony would be adverse to appellant. We are satisfied, however, that these questions did not contribute to the conviction. *United States v. Free,* 141 U.S. App.D.C. 198, 202–03, 437 F.2d 631, 635–36 (1970); *see Reed v. United States,* 403 A.2d 725, 730 n. 7 (D.C.1979); *accord Parks v. United States,* 451 A.2d 591, 614 (D.C. 1982), *cert. denied,* — U.S. —, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983) (prosecutor's failure to seek court permission for "missing witness" argument not "grave misconduct" since argument "did not directly urge the jury to draw ... an inference adverse to appellant.") (quoting *Fletcher v. United States,* 335 A.2d 248, 250 (D.C. 1975)). The number of questions was limited and once the objection was sustained the prosecutor moved on to ask appellant about who he remembered being in the alley.

We note that there was no objection by the defense to the prosecutor's

question which indicated that appellant had heard everyone else testify before he took the witness stand. This court has indicated it is impermissible for the prosecutor to comment in closing argument on appellant's exercise of his Sixth Amendment right to confront witnesses. *(Phillip) Dyson v. United States,* 418 A.2d 127, 131 (D.C.1980) and cases cited therein. Accomplishing the same result by cross-examination is no less objectionable, since the prosecutor thereby can also seek to have the jury draw impermissible inferences from appellant's exercise of his constitutional right to confront witnesses. *See Fornah v. United States,* 460 A.2d 556, 559–60 (D.C. 1983) (improper to ask defendant on cross-examination why he did not testify before grand jury).[9] Such references should, therefore, be avoided in questioning. The prosecutor had been focusing on the physical evidence which was found in the alley after the murder and his questions were designed to point out that there was no evidence of a crap game; the objectionable part of the question was unnecessary to accomplish this legitimate purpose. Still we conclude that the question does not constitute plain error. It does not appear to have been prominent during the impeachment or intended, in this context, to do more than explore appellant's direct testimony about what had happened in the alley on the night of the murder. *See Fornah, supra,* 460 A.2d 560–61 (in closing argument, no plain error where intent by prosecutor was not to undercut constitutional rights but to suggest theory of case based on permissible inferences from evidence).

### B.

In the event none of the several allegations of prosecutorial misconduct requires reversal, appellant contends reversal of his

---

**9.** *See also Grunewald v. United States,* 353 U.S. 391, 421–22, 425, 77 S.Ct. 963, 982–83, 984, 1 L.Ed.2d 931 (1957) (use on cross-examination, over defense objection, of Fifth Amendment constitutional privilege to reflect on defendant's credibility held error); (Black, J., concurring) ("I can think of no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it.").

convictions is nonetheless required because the instances of improper conduct by the prosecutor amount to a "veil of prejudice" which deprived him of a fair trial and due process of law. We disagree.

 The main thrust of appellant's "veil of prejudice" claim is directed at the prosecutor's closing and rebuttal arguments. Since appellant's trial counsel did not object to either, we may reverse only if the misconduct rises to the level of plain error. *Watts v. United States*, 362 A.2d 706, 708 (D.C.1976) (en banc). The analysis which is required when a claim of prosecutorial misconduct during argument is raised for the first time on appeal has been stated by this court as follows:

> We first evaluate for misconduct the asserted examples of improper comment. If we find that misconduct occurred, we then determine whether the erroneous statements rose to the level of "substantial prejudice." (*Phillip*) *Dyson v. United States*, 418 A.2d 127, 132 (D.C.1980). As appellant failed to object at trial, we will reverse his conviction only if this substantial prejudice so clearly prejudiced his substantial rights as to jeopardize the very fairness and integrity of his trial. *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc).

*McCowan v. United States*, 458 A.2d 1191, 1196–97 (D.C.1983). In determining whether the prosecutorial misconduct was substantially prejudicial and thus infected the verdict, we must employ a balancing test:

> The applicable test in this jurisdiction in determining whether prosecutorial misconduct infects a verdict is to balance, on the one hand, the gravity of the misconduct, its direct relationship to the issue of innocence or guilt, and the effect of specific corrective instructions by the trial court, if any, against the weight of the evidence of appellant's guilt.

*Villacres v. United States*, 357 A.2d 423, 428 (D.C.1976); *(Duane) Dyson v. United States*, 450 A.2d 432, 437 (D.C.1982).

The prosecutor began his closing argument by suggesting that appellant was on trial because he was careless in his dealings with Gordon and Primrose as evidenced by the fact they had testified against him at trial. The remainder of his argument was predominantly a restatement of the evidence and argument based on reasonable inferences therefrom, but at times, the prosecutor went beyond such inferences by referring to matters within his personal knowledge. The government has conceded as much during oral argument with respect to the prosecutor's comments about what it takes to survive at 14th and U Streets, but argues there was rhetoric on both sides in this hard fought case and nothing the prosecutor did was misconduct in view of the evidence before the jury.

We agree there was considerable evidence on which the prosecutor could base his inferences about appellant's activity at 14th and U Streets. Indeed, some of the argument about which appellant now complains was based on testimony elicited by defense counsel in an effort to rebut the government's strong identification evidence.[10] Thus, except as discussed below, our review of the record indicates that appellant's contentions amount primarily to a complaint about emphasis, which is insufficient here to support a finding of prosecutorial misconduct. *Accord Parks, supra*, 451 A.2d at 612 & n. 43; *Viereck v. United States*, 318 U.S. 236, 247–48, 63 S.Ct. 561, 566–67, 87 L.Ed. 734 (1943).

 The prosecutor did err in expressing his personal belief during closing argument about appellant's alleged state of mind during the offense and trial. He told the jury that appellant and his friends

---

**10.** Through cross-examination of the police officers, the defense elicited evidence that a lot of illegal activity and numerous knives could be found at 14th and U Streets. In closing argument, defense counsel suggested this evidence bolstered appellant's defense of misidentification and lessened the probative value of his possession of a knife similar to the murder weapon.

"thought they had left behind two dead men" and that when Gordon appeared to testify he "gave Mr. Sherrod here the surprise of his life...."[11] This court has admonished lawyers "to eschew personal opinions in the course of arguments to juries because this can divert jurors from their role." *(Phillip) Dyson, supra,* 418 A.2d at 130; *McCowan, supra,* 458 A.2d at 1198; *Bates v. United States,* 403 A.2d 1159, 1163 (D.C.1979); *Jenkins v. United States,* 374 A.2d 581, 584 (D.C.), *cert. denied,* 434 U.S. 894, 98 S.Ct. 274, 54 L.Ed.2d 182 (1977); *Villacres, supra,* 357 A.2d at 425–26; *Hyman v. United States,* 342 A.2d 43, 45 (D.C.1975). The purpose of the rule that an attorney should not express his or her opinion on the ultimate issues in the case to the jury during closing argument is "to keep the focus on the *evidence* and to eliminate the need for opposing counsel to meet 'opinions' by urging his own contrary opinion." *Harris v. United States,* 131 U.S.App.D.C. 105, 107, 402 F.2d 656, 658 (1968) (emphasis in original).[12]

 The prosecutor's argument about the demeanor of two witnesses also contained expressions of personal opinion. While the prosecutor is entitled to comment on the witnesses' objective demeanor, he is not permitted to argue, in the absence of evidence in the record, about a witness' fear where to do so "exceed[s] the bounds of permissible comment by invading the province of the jury's responsibility to as-

sess the demeanor of the witnesses." *(Phillip) Dyson, supra,* 418 A.2d at 130; *McCowan, supra,* 458 A.2d at 1198 & n. 12. We do not dispute the government's contention that there was evidence on which reasonable inferences about Gordon's and Primrose's fears could be based, and in rebuttal, the prosecutor could properly respond to defense counsel's argument to the jury that the witnesses' subsequent dealings with appellant belied their fear of appellant. *Medina v. United States,* 315 A.2d 169 (D.C.1974). That there was some objective evidence on which reasonable inferences about the witnesses' fears could be based does not change the rule that subjective demeanor evidence is for the jury to evaluate. *(Phillip) Dyson, supra; McCowan, supra.* What the jury sees in a witness' face or hears in a witness' voice is for the jury to determine, not counsel. Thus, it was improper for the prosecutor to tell the jury that it saw fear in the faces and voices of Gordon and Primrose.[13] It was also improper for the prosecutor to comment that Primrose's difficulty in saying appellant's name, "Chico", was evidence of his fear; his speech difficulty is equally consistent, on the record before us, with the evidence that he stuttered, and the assessment of his difficulty was for the jury to determine.[14]

 As other claims of prosecutorial misconduct, appellant contends that the prosecutor's comments on the credibility of

---

**11.** Defense counsel told the jury in his closing argument that appellant was not surprised that Gordon had testified at trial since Gordon had testified against him at the grand jury. The prosecutor objected at the close of the defense counsel's argument, because of the reference to the grand jury testimony, but declined to ask for a mistrial.

**12.** The attorney's "personal belief has no real bearing on the issue; no witness would be permitted to so testify, even under oath, and subject to cross-examination, much less the lawyer without either." *Harris, supra,* 131 U.S.App.D.C. at 107, 402 F.2d at 658 (quoting H. Drinker, *Legal Ethics* 147 (1953)) (footnotes omitted). As Chief Justice Burger, then Circuit Judge, concluded in *Harris,*

The personal evaluations and opinions of trial counsel are at best boring irrelevancies and a distasteful cliche-type argument. At worst, they may be a vague form of unsworn and irrelevant testimony.
131 U.S.App.D.C. at 108, 402 F.2d at 659.

**13.** In *Hyman, supra,* 342 A.2d at 45, this court held improper the prosecutor's comment to the jury: "You saw [the witness'] demeanor on the stand yesterday. I think you can fairly conclude that he appeared almost irrational."

**14.** In *(Phillip) Dyson, supra,* 418 A.2d at 130 the prosecutor "characterized the witness' pause as an opportunity to fabricate." This court held the prosecutor had "exceeded the bounds of permissible comment...."

the two defense witnesses and on appellant's decision to testify last were improper. This court has held that it is error for the prosecutor to express an opinion about the veracity of a witness. *(Phillip) Dyson, supra,* 418 A.2d at 130; *Powell v. United States,* 455 A.2d 405, 408 (D.C.1983). However, the comments challenged here were reasonable inferences from the summarized testimony of the two defense witnesses; their testimony was full of inconsistencies and the prosecutor was free to comment on them. *United States v. Jones,* 157 U.S.App.D.C. 158, 164–65, 482 F.2d 747, 753–54 (1973); *Arnold v. United States,* 467 A.2d 136, 137–38 (D.C.1983). Conversely, as previously noted, a prosecutor's comment during closing argument on a defendant's decision to testify last has been construed by this court as an attempt to have the jury draw adverse inferences from the defendant's exercise of his constitutional right to confront witnesses and is thus impermissible. *(Phillip) Dyson, supra,* 418 A.2d at 131; *Jenkins, supra,* 347 A.2d at 584.

■■■■ Appellant also contends that the prosecutor grossly misstated the evidence. As an example he cites the prosecutor's argument to the jury summarizing Dr. Kim's testimony. Contrary to one of the prosecutor's statements, Dr. Kim had not expressed his medical opinion about whether any one of the stab wounds would have been fatal; his testimony was that multiple stab wounds caused Moon's death and eight of the ten wounds were deep. Hence, the prosecutor's comment amounted to unsworn testimony, which is forbid-

den. However, immediately following the single stab comment the prosecutor reviewed Dr. Kim's testimony in detail. There was also evidence to support the inference regarding the vicious and gratuitous nature of the assaults. Thus, we view the objectionable comment, and others cited by appellant, as being of the type described by the Supreme Court in *Donnelly v. De-Christoforo,* 416 U.S. 637, 646–47, 94 S.Ct. 1868, 1872–73, 40 L.Ed.2d 431 (1974), and find insufficient grounds upon which to conclude the prosecutor's action should be deemed a deliberate effort to mislead the jury.[15]

■■■■ During a part of the prosecutor's rebuttal argument, appellant contends the prosecutor engaged in a form of argument that this court has condemned. *See McCowan, supra,* 458 A.2d at 1199; *Powell, supra,* 455 A.2d at 410 and cases cited therein. He suggests the prosecutor's comments about the way in which appellant lived, appellant's position of authority on 14th Street, his "friends," and what appellant "counted on" were designed to inflame the jury and introduce irrelevant factors, unrelated to the evidence at trial, into the jury's deliberations. We agree that some of the prosecutor's comments could better have been left unsaid, *Sellars v. United States,* 401 A.2d 974, 977 (D.C.1979), but find that a substantial portion of the rebuttal argument was in response to the defense counsel's closing, which invited the prosecutor to attack the defense characterizations of the evidence, the government's witnesses and appellant.[16] *See Christian v. United States,* 394 A.2d 1, 33 n. 86

**15.** Appellant also alleges error in the comments by the prosecutor describing Primrose as a man who lived a normal life ("except he sometimes takes heroin") "and didn't put on a fancy three-piece suit and try to be something that he isn't." Although these comments were unnecessary and irrelevant, we do not find them prejudicial in view of defense counsel's cross-examination of Primrose. *See Villacres, supra,* 357 A.2d at 426, n. 2 (examples of "boring irrelevancies"). Appellant further contends that the prosecutor expressed his personal belief of appellant's guilt, but our review of the record indicates that the prosecutor emphasized the strength of the

government's case and the weaknesses of the defense witnesses' testimony. *See (Phillip) Dyson, supra,* 418 A.2d at 132.

**16.** Defense counsel's argument questioned, for example, whether the government had disclosed all of the relevant evidence and compared the appellant, a man without a prior criminal record who occasionally gambled, with the government witnesses (Primrose and Gordon) who were heroin users with prior criminal records.

(D.C.1978), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979); *Watts v. United States*, 449 A.2d 308, 313 (D.C. 1979); *Medina, supra*, 315 A.2d at 170–71; *Arnold, supra*, 467 A.2d at 138 ("[t]he prosecutor's comments were more in the nature of argumentation than outright expressions of personal opinion"). Viewed in context, the prosecutor's references to appellant's activities were consistent with reasonable inferences from the evidence about what he was doing on the night of the murder and what he did at 14th and U Streets. *Tuckson v. United States*, 364 A.2d 138, 142 (D.C.1976); *see Jackson v. United States*, 329 A.2d 782, 791 (D.C. 1974). The rebuttal argument was not lengthy, and was followed by the instructions to the jury that counsel's arguments were not evidence and that the jury was the sole judge of credibility and the facts.

### C.

 Having reviewed appellant's claims of misconduct, we consider whether the instances of prosecutorial misconduct constitute plain error. In evaluating the relationship of the misconduct to the issue of innocence or guilt, we note that the prosecutor aggressively presented the government's evidence, extensively cross-examined the defense witnesses and forcefully argued to the jury that he had proved his case. His trial performance unquestionably attacked the picture of appellant which defense counsel presented through testimony and in his closing argument to the jury. *(Phillip) Dyson, supra*, 418 A.2d at 129 ("It is beyond dispute that the government may prosecute vigorously and zealously."). Aspects of the prosecutor's conduct, as we have noted, should be, and we trust will be, avoided in the future. But the instances in which the prosecutor acted improperly, while not condoned, do not, as appellant urges, separately constitute plain error or add up to an impermissible course of intentional misconduct throughout the trial.[17]

 Thus, for example, the prosecutor's comments which involved personal opinion related to how appellant was perceived by others and did not bear directly on appellant's credibility.[18] His objectionable comment that appellant testified last arose in the context of highlighting the conflicting testimony of defense witnesses. In view of this court's previous admonition to the trial court not to countenance such comments on a defendant's presence (*Jenkins, supra*, 374 A.2d at 584), the absence of admonition by the trial court lends some credence to the notion that, in context, the comment was not viewed as prejudicial. *See Reed, supra*, 403 A.2d at 730–31 n. 7. Nor did the prosecutor's misstatement of the medical testimony relate directly to the innocence or guilt of appellant.

**17.** Appellate counsel stated at oral argument that unfounded assertions about a witness's fear of the accused can be extremely prejudicial and may be impossible to overcome in a trial before a jury. Such concerns should, nevertheless, first be addressed to the trial court. If done in a timely manner, corrective measures can be undertaken by the trial court. *Harris, supra*, 131 U.S.App.D.C. at 105–06, 402 F.2d at 656. This court has noted that:

> It is peculiarly within the knowledge of the trial judge whether remarks of counsel during the trial tend to prejudice the cause of a party. The courtroom atmosphere, prior remarks which have provoked the questioned statements, and other factors which cannot be appraised by a reviewing court may render remarks of counsel innocuous, although they

> may appear viciously prejudicial when removed from their setting.

*Smith v. United States*, 315 A.2d 163, 167 (D.C.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974) (quoting *United States v. Goodman*, 110 F.2d 390, 394 (7th Cir.1940)); *Harling, supra*, 382 A.2d at 847 (proper scope of closing arguments subject to broad discretion of the trial judge). In the absence of objection at trial, appellate counsel face the difficult task of demonstrating that the error complained of is "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts, supra*.

**18.** Compare, for example, *Villacres, supra*, where the prosecutor supplied a confession by the accused to his mother when none was in evidence. *Accord Parks, supra*, 451 A.2d at 613.

■ The trial judge twice instructed the jury that the arguments of counsel were not evidence. He told the jury that "in the heat of the argument [counsel] may give you what they believe to be the evidence in the case," but the arguments are not evidence, they are only "the contentions of both sides." [19] The trial judge also explained the purpose of the closing arguments to the jury and repeated a second time that the arguments are not evidence. His instructions to the jury also included the standard instructions that the jury is to determine the facts, the weight, effect and value of the evidence as well as the credibility of witnesses, and that their recollection controls over references by either counsel to matters of evidence. The jury is presumed, unless the contrary appears, to follow the instructions, *Smith, supra* note 17, 315 A.2d at 167, and we find nothing in the record to suggest that the jury did not do so.

Finally, the weight of the evidence of appellant's guilt was very strong. Not only was there an eyewitness (Primrose) to the murder and assault, but the appellant was known to the eyewitness, thus weakening his defenses of innocent presence and misidentification. The testimony of a second witness (Gordon), who saw the events immediately before and after the assaults, provided strong corroboration of the eyewitness' testimony; this witness also knew appellant from prior associations and had spoken with him on the night of the murder. Appellant's witnesses did little to strengthen his defense; his two friends not only contradicted each other on key points, but confirmed parts of the government's evidence. Appellant's own testimony placed him at the scene of the assaults and

he was arrested with a knife which was similar to the weapon which inflicted Moon's wounds.

■ Accordingly, we hold, after applying the balancing test enunciated in *Villacres*, that the challenged remarks were not so clearly prejudicial as to jeopardize the fairness and integrity of the trial. What appellant now terms "flagrant, egregious and intentional misconduct of the prosecutor" was either objected to by defense counsel and sustained by the trial judge, or did not cause defense counsel to object at all. *Parks, supra*, 451 A.2d at 613 (failure to object "constitutes some evidence that appellants did not immediately perceive the challenged argument as prejudicial."). His allegation that the accumulation of incidents was "severely prejudicial" ignores the evidence which was before the jury as well as the active role of defense counsel and the rulings of the trial judge. Moreover, this court has "held consistently that a determination of whether prosecutorial misconduct amounts to prejudicial error depends in good part on the relative strength of the government's case." *(Duane) Dyson supra*, 450 A.2d at 439 (citing *Smith supra*, 315 A.2d at 166); *see also Reed supra*, 403 A.2d at 731, and cases cited therein. We hold the errors here did not so affect the conduct of the trial as to deny appellant a fair trial, and do not rise to the level of plain error requiring reversal of his convictions.

### III.

Appellant's second claim of error concerns hearsay evidence. He contends that the trial court committed reversible error by admitting into evidence Detective Kilcul-

---

**19.** The instruction was:

Now, the law is an advocacy [sic] and counsel, in making closing arguments, many times in the heat of the argument may give you what they believe to be the evidence in the case.

Now, you have just listened before lunch to the closing arguments of each counsel. Counsel in their closing arguments gave you what they thought to be the evidence. You are

reminded that the arguments you have just heard, one, are not evidence, they are not evidence. Those arguments were intended and, as I said, even when counsel gives his opinion of what the evidence was, that's his opinion.

They are only given and intended to aid you in determining and deciding and understanding the evidence, that's all, and to give you the contentions of both sides.

len's testimony about two conversations with Primrose shortly after the killing, and by admitting the written statement which Gordon gave to the police shortly after the murder.

Detective Kilcullen testified that on the night of the assaults Primrose identified "Chico" as one of his assailants and provided a physical description. The detective also testified that during a second interview two days later Primrose identified appellant from a photo spread and then repeated Primrose's statements about the drug sale and the attacks in the alley. No objection was made to the testimony about the second interview.[20]

■■■ The testimony about the first conversation was admissible as substantive evidence under an exception to the hearsay rule for prior description testimony, *Morris v. United States*, 398 A.2d 333, 338 (D.C. 1978). The testimony regarding the photo spread identification at the second interview was admissible under the hearsay exception for prior identification testimony. *Rice v. United States*, 437 A.2d 582 (D.C. 1981). However, the testimony recounting Primrose's description of the sale and the attacks was a prior consistent statement which was inadmissible under any exception to the hearsay rule.

■■■ It is well settled that prior consistent statements of a witness are inadmissible to support one's own unimpeached witness. *Rease v. United States*, 403 A.2d 322, 327 (D.C.1979). Such statements are admissible "only in those 'exceptional situations' in which they can be of very clear help to the factfinder in determining whether the witness is truthful." *Id.* (quoting *Coltrane v. United States*, 135 U.S.App.D.C. 295, 304, 418 F.2d 1131, 1140 (1969)). Furthermore, if rehabilitation after impeachment is required, the evidence must be directed only at the particular impeachment involved. *Rease, supra,* 403 A.2d at 328. These statements are excluded because "mere repetition does not imply veracity." *Coltrane, supra,* 135 U.S.App. D.C. at 304, 418 F.2d at 1140.

■■■ The exceptions to this general prohibition are well defined.[21] The government offers no justification which would render the testimony recounting Primrose's story admissible and we can find none.[22] However, the declarant, Primrose, was available for cross-examination and had in fact been cross-examined, and the detective's testimony was brief and "substantially comported with the declarant's testimony at trial." *Johnson v. United States*, 434 A.2d 415, 420 (D.C.1981). Accordingly, we hold that the error in admitting the

**20.** Appellant asserts that the objection made to the description statements elicited at the first interview was a sufficient objection to the testimony about the statements from the second interview. We disagree. The statements from the second interview, and the basis for the evidentiary objection, were separate and distinct from the prior testimony and objection. Counsel did not object to those statements, and, therefore, the plain error standard applies. *Watts, supra.*

**21.** First, if a witness is impeached by a showing that the witness has reason to lie in court, then an out-of-court consistent statement can be introduced if the out-of-court statement was made at a time, or under circumstances, in which the witness had no reason to lie. *Reed v. United States*, 452 A.2d 1173, 1180 (D.C.1982) (court erred in admitting prior consistent statement that did not antedate alleged motive to lie); *Copes v. United States,*

120 U.S.App.D.C. 234, 345 F.2d 723 (1964) (court did not err in admitting prior consistent statement made at a time when, although witness had same reason to lie as she did at trial, she believed herself to be dying). Second, if "the witness' testimony has been impeached by a portion of a statement which also contains relevant information that could be used to meet the force of the impeachment," such additional relevant information from the statement is admissible even though it constitutes a prior consistent statement. *Rease v. United States*, 403 A.2d 322, 328 n. 7 (D.C.1979) (per curiam) (citations omitted). *Sherer v. United States*, 470 A.2d 732, 740 n. 8 (D.C.1983).

**22.** *See United States v. Muscato*, 534 F.Supp. 969 (E.D.N.Y.1982) (Weinstein, C.J.) (discussing the definition of hearsay, under the federal rules of evidence, in terms of its function in the development of the government's case).

detective's testimony concerning Primrose's prior consistent statements, was not plain error.

Gordon's statement to the police was also inadmissible hearsay. The prosecutor offered the statement for admission into evidence without any proffer of the justification for its admission, and the trial judge admitted it without explanation over defense counsel's objection to its admission as hearsay. Gordon's statement to the police would have been admissible only under the exception which permits admission of a prior consistent statement if portions of the statement have been used during cross-examination to impeach the witness, and it also contains relevant information to meet the force of the impeachment. *Coltrane, supra,* 135 U.S.App.D.C. at 304, 418 F.2d at 1140; *Sherer, supra* note 21, 470 A.2d at 740 n. 8.

■ During direct examination, the prosecutor asked Gordon whether he had seen appellant after his arrest, and about the substance of any conversations they had had. Gordon replied he had seen appellant by chance on the street and that appellant had asked if he had spoken to the police. On recross-examination, defense counsel attempted to impeach Gordon, in order to show that he was not afraid of appellant, by questioning when he had first mentioned this conversation to the police or the prosecutor; defense counsel referred to the fact the statement which Gordon had given to the police did not mention a subsequent meeting. To rehabilitate Gordon's testimony, the prosecutor asked whether he had spoken with appellant before he gave the statement to the police, and Gordon replied he had not. Therefore, the only relevance of the statement was the date on

which it was given and no justification existed for the admission of the entire statement simply to show the date.[23]

■ We hold that Gordon's statement to the police was inadmissible hearsay as to all except the date, and therefore, its admission was error. The error does not require reversal, however. Although the statement was potentially prejudicial because it reinforced Gordon's credibility, there "was ample indication of the truthfulness of [his] testimony, apart from the out-of-court [statement], to enable the jury reasonably to have found him a credible witness." *Reed v. United States,* 452 A.2d 1173, 1181 (D.C.1982). His testimony about the drug sale was consistent with Primrose's testimony and partly corroborated by Moon's wounds and the presence of heroin in his system. It was contradicted by appellant's friends, but their credibility was substantially impeached by their conflicting testimony. We note, too, that defense counsel, who first brought Gordon's statement to the jury's attention, had an opportunity prior to trial to prepare to meet the force of the statement. The trial judge instructed the jury on the limited purpose for which the prior consistent statement was admitted into evidence and under these circumstances we conclude that any prejudice to appellant was not so substantial as to require reversal of his convictions. *Id.*

### IV.

Appellant's third claim of error involves the revocation of his bond during trial. He contends that he was prejudiced by the trial judge's decision to revoke his bond at the close of the government's case and to

**23.** This is not a situation, as in *Sherer, supra,* in which defense counsel impeached the witness on the details contained in the prior statement, by pointing out discrepancies and then arguing that these differences, between the prior statement and the witness trial testimony, indicated that the witness' testimony was a fabrication. The prosecutor in *Sherer* was permitted on redirect to rehabilitate the witness by examining him more fully about the statement to show that

the trial testimony was generally consistent with the prior statement and that the testimony, therefore, could be credited even though several of the details were incorrect. 470 A.2d at 740. In the instant case the issue raised by defense counsel related to when Gordon's statement was given, not to the details in the statement concerning what happened on October 14, 1981. Consequently, the recounting of those events in Gordon's statement was inadmissible hearsay.

detain him for the remainder of the trial.[24] Appellant asserts the revocation had a chilling effect on his ability to testify free from fear and that his potential witnesses were placed in fear and led to believe the trial judge was ill-disposed towards the defense. He also contends that the revocation had a prejudicial impact on the jurors, who could not have helped but notice the change in his status, and who likely attributed the court's actions to a belief on the part of the judge in appellant's guilt. We find no error.

In *Murphy v. Hunt*, 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982), the Supreme Court held that a challenge to the constitutionality of pretrial detention is rendered moot after conviction of the underlying charges, and appellant, therefore, cannot challenge the trial judge's authority to revoke his bond during trial. Appellant nonetheless contends that regardless of the authority of the trial judge to take such action, the revocation constituted error because it prejudiced his right to a fair trial. Specifically, he alleges that on the first two days of trial the jurors had seen him outside of the courtroom and in the cafeteria and that his absence from those areas implied that he had been detained, which further implied that the trial judge thought he was guilty as charged.

Essentially, appellant's contentions invite this court to engage in speculation that the jurors saw appellant outside of the courtroom and, assuming they had, that his subsequent absence was noticed by them with adverse consequences. Even if his absence was noticed, it is pure speculation to suppose that jurors would conclude he was not in the cafeteria because his bond had been revoked.[25] Moreover, the trial judge instructed the jury that it must not view his actions or comments as indicating either how he wanted the jury to determine the issues or facts, or his opinion or view of the facts. Our review of the record fails to uncover support for appellant's claim that he or his witnesses were hindered in their ability to testify, and we decline to speculate on the basis of appellant's unsupported assertions. Therefore, we find that appellant has not shown that prejudice resulted from his detention. *Watts v. United States*, 449 A.2d 308, 311 (D.C.1982); *Bostick v. United States*, 400 F.2d 449, 452 (5th Cir.), *cert. denied*, 393 U.S. 1068, 89 S.Ct. 725, 21 L.Ed.2d 712 (1969).

## V.

Appellant's fourth claim of error relates to the use of trial transcripts during closing argument. He argues that the trial judge's refusal to let defense counsel read from the trial transcripts of Primrose's and Gordon's testimony during his closing argument was extremely prejudicial because he could not otherwise overcome the prosecutor's alleged distortions of the evidence.

The trial judge had initially agreed to let defense counsel read from the trial transcripts during his closing argument. When the prosecutor objected on the basis that this would highlight portions of the evidence in contravention of the rule that the juror's memory controls, the trial judge ruled that defense counsel would be allowed only to refer to the transcript during his closing argument. In support of his position appellant relies on two cases which

---

24. Appellant was arrested and presented on October 18, 1981, when he was ordered released on the condition that he post a surety bond of $2,000. He did, and was released. Prior to trial, on July 29, 1982, the government filed a "Motion for Review of Conditions of Defendant's Release on an Expedited Basis" which appellant opposed, and the trial judge took under advisement. At the beginning of appellant's trial, on September 2, 1982, the trial court heard argument on the motion at the government's request and continued the matter under advise-

ment. When the prosecutor renewed his request for bond revocation at the end of the government's case-in-chief, the trial judge ordered appellant detained over objection by defense counsel. Appellant did not appeal the revocation of his bond pursuant to D.C.Code § 23–1324 (1981).

25. The trial judge permitted him to continue to wear civilian clothes during the trial.

are inapplicable insofar as both concern the trial court's discretion to read portions of the transcript back to the jury upon the jury's request. *United States v. McCoy,* 517 F.2d 41, 44 (7th Cir.1975); *Stone v. United States,* 506 F.2d 561 (8th Cir.1974). Both courts concluded, however, that the issue was committed to the sound discretion of the trial court.[26]

There is precedent for allowing counsel to read portions of the transcript during closing argument. *United States v. Kuta,* 518 F.2d 947, 954 (7th Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975) ("no reason to establish per se rule penalizing accuracy"); *Byrnes v. United States,* 327 F.2d 825, 840 (9th Cir.) *cert. denied,* 377 U.S. 970, 84 S.Ct. 1652, 12 L.Ed.2d 739 (1964) ("only safe was to be accurate" is to read trial transcription of witness' testimony).[27] At least one court has held that the discretionary right of the trial court to read testimony can be delegated to counsel. *Bing Fa Yuen v. State,* 43 Md.App. 109, 403 A.2d 819, 826 (1979). We are aware of only one jurisdiction which has adopted a per se rule prohibiting counsel from reading from the record. *People v. Hoggs,* 17 Ill.App.3d 67, 70, 307 N.E.2d 800, 802 (1974) (improper to read from a trial transcript during closing argument since jury "must pass upon the whole testimony free of the over-emphasis given

any portion of it by verbatim repetition during the trial's waning moments.").

 It seems to us that the better rule leaves the question of whether counsel may read from the transcript during closing argument to the sound discretion of the trial court. The use of transcripts is already permissible, subject to appropriate checks against distortion and unfairness to or embarrassment of a witness, during the presentation of evidence. Under Super.Ct. Crim.R. 15(e)(2), permitting use of a deposition to impeach a witness, the adverse party is allowed to require that all of the relevant portions of the deposition be introduced and also to introduce any other parts. Impeachment is, of course, also permitted by use of transcriptions from a first trial upon a retrial, *Ibn-Tomas v. United States,* 407 A.2d 626, 644-46 (D.C.1979), and where a prior inconsistent statement is involved, a limiting instruction may be required. *Brooks v. United States,* 448 A.2d 253, 259 (D.C.1982); *Lofty v. United States,* 277 A.2d 99 (D.C.1971); *Johnson v. United States,* 387 A.2d 1084 (D.C.1978) (en banc). Insofar as there is concern that allowing counsel to read from a transcript will unduly emphasize selected portions of the evidence, we find persuasive the observation by the United States Court of Appeals for the Seventh Circuit, regarding the trial court's reading of portions of tran-

---

**26.** This view is also followed in three other circuits: *United States v. Pollak,* 474 F.2d 828, 832 (2nd Cir.1973); *United States v. Chicarelli,* 445 F.2d 1111, 1114-15 (3rd Cir.1971); *United States v. De Palma,* 414 F.2d 394, 396 (9th Cir. 1969), *cert. denied,* 396 U.S. 1046, 90 S.Ct. 697, 24 L.Ed.2d 690 (1970). *Cf.* Standards Relating to Trial by Jury (ABA Project on Minimum Standards of Criminal Justice) § 14-4.2(a) (2d Ed.1982 Supplement, Vol. III) (ABA 1982) (whenever the jury's request is reasonable, the court shall have the requested parts of the testimony read to the jury).

**27.** *See, e.g., Floen v. Sund,* 255 Minn. 211, 218, 96 N.W.2d 563, 567 (1959) (in personal injury case, "a portion of physician's testimony read to jury to refresh their recollection"); *Randall v. Steelman,* 294 S.W.2d 588, 594 (Mo.App.1956); *Douglas v. Duvall,* 5 Utah 2d 429, 431, 304 P.2d 373, 374-75 (1956) (in civil action for damages

from false representation) (Wade, J., concurring):

> It would no more be undue emphasis for him to read an accurate statement of the testimony than it would for counsel to state his recollection thereof. True, such reading might be more impressive on the jury but only because they would be more impressed by an accurate statement of the testimony than they would be by a statement from memory of counsel's version of such testimony. To hold that such is a valid reason for denying the right to read from a transcript is to place a premium on inaccuracy and invite incorrect findings of fact.

*Contra, People v. Willy,* 301 Ill. 307, 328, 133 N.E. 859, 866 (1921); *People v. Hoggs,* 17 Ill. App.3d 67, 70, 307 N.E.2d 800, 803 (1974) (only "paraphrased recapitulation of testimony" based on recollection from counsel's own notes is permissible).

scripts upon jury request: "The concern for undue emphasis is even less where the reading occurs in the context of closing arguments which review the entire evidence for the jury." *Kuta, supra,* 518 F.2d at 954. *See supra* note 27. Moreover, under the procedure we suggest below, the trial court can take appropriate steps to address that concern.

The interest at stake is the broad right of argument by counsel to the jury. *Bing Fa Yuen, supra,* 43 Md.App. 109, 403 A.2d at 826. Under our adversary system, counsel are already permitted to make closing arguments to the jury presenting their contentions about what the evidence shows with relatively few restrictions. Super.Ct. Crim.R. 29.1; *Powell, supra,* 455 A.2d at 408 (counsel are presumed to know the rules of the court and of their profession); *Harling, supra,* 382 A.2d at 847 (proper scope of closing argument subject to broad discretion of trial court). By arguing in the manner they think will best impress the jury of the merits of their case, counsel's contentions invariably highlight portions of the evidence. As long as they do so without misrepresentation or unfair or dilatory tactics, and opposing counsel has the opportunity to respond, we see no compelling reason to adopt a per se rule prohibiting counsel from reading a portion of the transcript during closing argument.

■■■■ Accordingly, we think the better practice would be for counsel, prior to the commencement of closing arguments, to make a proffer to the trial court of what portions of the transcript he intends to read and for what purpose. By so doing, and allowing opposing counsel to be heard on the request, the trial court can exercise its discretion, placing any appropriate limitations on out-of-context readings of what purports to be an official record of what was said. The trial judge can evaluate counsel's proffer and determine the likelihood of prejudice if the transcript is or is not read. *See Bing Fa Yuen, supra,* 43 Md.App. 109, 403 A.2d at 825–26 (trial court must be given proffer as to what portions of the transcript counsel intends to read and for what purpose, must actually exercise its discretion, and cannot automatically exclude the use of transcripts). Save in extreme circumstances, we see no reason for the trial court not to permit counsel to read portions of a transcript, especially when opposing counsel will have an opportunity, if desired, to read additional portions of the transcript to supply allegedly missing context. A trial judge does not, however, necessarily abuse his discretion when he denies such a request.

■■■■ On the record in the instant case, we find no abuse of discretion by the trial judge. Defense counsel was permitted to refer to the trial transcripts as an aide to his memory in incorporating comments on the witnesses' testimony in his closing argument. He in fact referred to the witnesses' testimony in his closing argument and we find no evidence of prejudice to appellant.

*Affirmed.*